**Elaine McEWING, Appellee**

v.

**LITITZ MUTUAL INSURANCE COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued April 2, 2013.
Filed July 8, 2013.

William G. Cilingin, Philadelphia, for appellant.

Lynda R. O'Brien, Philadelphia, for appellee.

BEFORE: STEVENS, P.J., OLSON, J., and STRASSBURGER, J.*

OPINION BY STEVENS, P.J.

Lititz Mutual Insurance Company ("Lititz") appeals from the judgment entered by the Court of Common Pleas of Philadelphia County in favor of Elaine McEwing in the amount of $30,000.00. Lititz claims the trial court erred in entering judgment in McEwing's favor as she was not entitled to coverage under her Homeowner's Insurance Policy that contained an applicable exclusion for damage caused by groundwater. Lititz also claims the trial court erred in refusing to strike the testimony of McEwing's expert witnesses. We remand for the trial court to correct its clerical error in the judgment amount but affirm the judgment in all other respects.

McEwing's three bedroom, ranch-style home in Bristol, Pennsylvania, has been insured by Lititz since 1995 under a named perils coverage policy. On or about December 17, 2009, McEwing's home sustained damage due to the deterioration of its supporting floor joists. As a result of this damage, the floor of the home dropped three to four inches into the crawlspace beneath the home. The walls in McEwing's living room, hallway, and bathroom separated from the floor and the ceiling. As McEwing's late husband, Joseph McEwing, had been diagnosed with terminal cancer and passed away shortly after the McEwings discovered the damage to their home, McEwing relied on the assis-

* Retired Senior Judge assigned to the Superior Court.

tance of her son-in-law, Mark Reardon, to help her file the claim with Lititz.

Reardon contacted public adjuster Walter Clark to assist McEwing in writing the insurance claim. Clark arranged to meet Reardon at McEwing's home in January 2010 to better assess the damages. Both Reardon and Clark crawled underneath the house on their stomachs to inspect the crawlspace, which has cinder block foundation walls. The distance from the cement floor to the subfloor of the home was twenty-four inches. Both men noted the home's wooden joists were rotted where they connected at the main support beam and into the sill plates. Neither Clark nor Reardon saw any standing water in the crawlspace. Clark noted he did not observe any deterioration in the block walls.

Clark submitted McEwing's claim to Lititz on January 18, 2010. While awaiting Lititz's resolution of her claim, McEwing arranged for Reardon to make temporary repairs to the joists until more permanent repairs could be properly made with insurance proceeds. McEwing purchased the materials for the repairs and Reardon replaced the broken joists and strengthened the existing joists by sistering them to new joists. McEwing stayed at Reardon's home for two months while the repairs were being completed.

Lititz retained an independent adjuster, Francis Beck, to assess the damages to McEwing's home. Clark met with Beck and showed him the damage to the interior of the home. Beck did not enter the crawlspace, but determined that it was necessary to have an engineer inspect the property. Beck retained the services of engineer G.P. Lamina, Jr., P.E., who initially came to assess the damage to McEwing's home on January 27, 2010, but rescheduled his inspection.[1] Lamina returned to inspect the property on January 29, 2010 and instructed his associate to go into the crawlspace, take pictures, and measure moisture levels.

Thereafter, Lamina issued a report in which he made specific findings that the wood floor joists dropped into the crawl space, causing the living room and bedroom floors to fail and the walls and ceiling to separate. Lamina noted that the crawlspace floor was wet and the cinderblock walls were moist with dark water marks. The report contains Lamina's measurements for the moisture content of the main beam and the supporting joints. Based on his findings, Lamina opined that the floor joists failed as a result of water damage. Lamina reasoned that water had permeated the concrete masonry units (CMU or cinder blocks) and reached the joists "which lost their shear and flexural strength to withstand the imposed live and dead loads and eventually caused the structural wood members to fail." Report, 2/17/10, at 2.

On March 18, 2010, Lou Tshudy, Senior Claim Examiner at Lititz, sent correspondence to notify McEwing that her insurance policy contained an exclusion for damage caused by groundwater. Ms.

---

1. The parties offered conflicting testimony as to why Lamina did not inspect McEwing's property on January 27, 2010. At trial, Lamina claimed he could not enter the crawl space because it was filled with water. N.T., 5/15/12, at 21, 44, 50–51. Lamina specifically stated that the water level was so high that if he crawled into the crawl space, he would probably drown. N.T. 5/15/12, at 50–51. Lamina did not take any photographs of this condition. N.T. 5/15/12, at 51. In contrast, Clark, McEwing's adjuster, had testified that Lamina rescheduled the inspection because he was not wearing appropriate clothing to access the crawl space underneath the home. N.T., 5/9/12, at 51. Clark claimed that there was no standing water in the crawl space or any evidence that the space had been filled with a foot of water. N.T., 5/9/12, at 51–52.

Tshudy cited Lamina's expert report and referred McEwing to the following language in the insurance policy:

### SECTION 1—EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

 \* \* \*

 c. **Water damage,** meaning:

 (1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by the wind;

 (2) Water which backs up through sewers or drains or which overflows from a sump; or

 (3) *Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool, or other structure.*

Lititz Insurance Policy ("Policy"), Form HO00030491, at 8–9 (emphasis added). Tshudy did not cite any other reason for denying McEwing coverage for the damage to her home besides the groundwater exclusion.

Walter Clark, McEwing's public adjuster, challenged this denial of coverage in several letters directed to Tshudy. Clark first cited the language in an extended coverage endorsement to the policy which provided "Limited Fungi, Wet or Dry Rot, or Bacteria Coverage." Endorsement, Form HO04320502. Although Lititz generally would not insure for loss caused by "constant or repeated seepage or leakage of water or the presence of condensation of humidity, moisture, or vapor, over a period of weeks, months or years," such loss would be covered under the endorsement if the "seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor and the resulting damage is unknown to all 'insureds' and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure." Endorsement, Form HO04320502, at 2. As McEwing and her late husband were elderly when the damage occurred and Mr. McEwing had recently lost his battle with terminal cancer, Clark asserted that there was no way the McEwings could have known about the humid conditions and resulting damage in their crawlspace.

In addition to the endorsement, Clark claimed the damages to McEwing's home were covered under the Additional Coverages subsection of the original policy in which Lititz agreed to "insure for direct physical loss to covered property involving *collapse of a building or any part of a building* caused only by ... hidden decay." Policy, Form HO00030491, at 5 (emphasis added). In response to Clark's letters, Tshudy did not challenge his assertions that McEwing would be eligible for coverage under the limited rot endorsement or the collapse provision, but essentially found these issues irrelevant as the groundwater exclusion would apply in all cases. Tshudy cited the language of the exclusion which states that any loss caused by surface water and/or water below the surface of the ground is excluded *"regardless of any other cause or event contributing concurrently or in any sequence to the loss."* Policy, Form HO00030491, at 8.

McEwing filed this action against Lititz on August 10, 2010, raising breach of contract and bad faith claims. The parties proceeded to a bench trial which was held

on May 9, 2012.[2] McEwing presented two expert witnesses, which included Ken Korger and Larry Hughes, P.E. Korger is a public adjuster who was retained by McEwing's attorney to provide estimates for the repairs to the home.[3] Korger prepared his first estimate based on his belief that McEwing's home would have to be razed to replace the floor joists and sill plates that support the home. However, after Lititz's adjuster, Francis Beck, sent Korger a revised copy of Korger's estimate highlighting items and fixtures that could be salvaged instead of replaced, Korger revised his estimate in light of Beck's suggested revisions. Korger testified on direct examination that his amended estimate of the cost to return McEwing's home to pre-loss condition was $90,729.64.

McEwing also presented the expert testimony of Larry Hughes, a licensed professional engineer and a certified construction inspector for residential properties. Hughes testified that he inspected McEwing's home in January 2011 and observed the deteriorated joists in the crawlspace. Hughes concluded the floor joists rotted as a result of high levels of humidity or moisture in the crawlspace over the years due to lack of ventilation. In opposition to defense expert Lamina's conclusion that water had filled the crawlspace and risen to the level of the joists, Hughes testified that there was no standing water or any evidence that the crawlspace had ever been filled with water. Hughes opined that the motor of the heating system, which was six to eight inches off the floor, would have failed if the crawlspace was inundated with water. Further, Hughes found no evidence that water had seeped through the CMU, as there was no deterioration of the mortar between the CMU or clay or dirt stains on the CMU.

At the conclusion of McEwing's case-in-chief, Lititz moved to strike the testimony of both Korger and Hughes and moved for a directed verdict. Lititz's attorney claimed McEwing had not proven her case with adequate professional engineering testimony as neither Korger nor Hughes offered testimony with sufficient factual foundation. The trial court denied these motions and Lititz proceeded to present its defense. Lamina testified as Lititz's expert witness and reaffirmed his conclusions that the joists of McEwing's home deteriorated because groundwater had (1) infiltrated the crawlspace and had reached the level of the joists and (2) permeated the cinder block foundation walls and had pushed its way into the block.

On May 31, 2012, the trial court entered judgment in favor of McEwing in the

2. We note that the certified record forwarded to this Court did not contain the trial transcripts or any of the parties' exhibits, which included the insurance policy at issue in this case. It is well-established that "this Court may only consider items which have been included in the certified record and those items which do not appear of record do not exist for appellate purposes." *Stumpf v. Nye,* 950 A.2d 1032, 1041 (Pa.Super.2008). The failure to include a document in the certified record is a "deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record." *Daniel v. Wyeth Pharmaceuticals, Inc.,* 15 A.3d 909, 936 (Pa.Super.2011). However, after we conducted an informal inquiry into the matter, the trial court was able to obtain these documents and certify them as a supplemental record. We remind Lititz's counsel that "the burden to produce a complete record for appellate review rests solely with the appellant." *Ferrante v. Ferrante,* 791 A.2d 399, 403 (Pa.Super.2002).

3. Although McEwing had originally retained Walter Clark as her public adjuster, Clark was not able to continue with McEwing's claim and provide estimates for the damage due to scheduling difficulties. N.T., 5/9/12, at 59–60. McEwing's attorney then retained Ken Korger to prepare the estimates.

amount of $30,000.00. In its order, the trial court made specific findings that it found McEwing's evidence to be credible, but found that Lamina, Lititz's expert engineer, was not credible. Lititz filed a Motion for Post–Trial Relief and McEwing responded by filing a reply to Lititz's Motion for Post–Trial Relief and a Motion to Mold the Verdict to include prejudgment interest. In an order docketed August 8, 2012, the trial court denied Lititz's Motion for Post–Trial Relief and molded the verdict to include $4,383.87 of prejudgment interest. However, the trial court did not specifically enter judgment before Lititz filed its notice of appeal.

■ On October 4, 2012, this Court directed Lititz to praecipe the trial court prothonotary to enter judgment as required by Pennsylvania Rule of Appellate Procedure 301, as the trial court's disposition of the parties' postverdict motions did not constitute an appealable order.[4] The trial court subsequently entered judgment on October 5, 2012. As a result, we will treat the parties' appeals as if they were filed after the entry of judgment, which is the appealable order. *See* Pa.R.A.P. 905(a) (providing that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof"); *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 948 A.2d 834, 842 (Pa.Super.2008) (treating the defendant's appeal from the verdict as having been taken from the final judgment when judgment was entered after the appeal was filed).

After judgment was entered, the trial court directed Lititz to file a Concise Statement of Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellant complied with the trial court's directions and filed a Concise Statement raising the following issues:

1. The Court committed an error of law in finding that there was coverage under the subject policy of homeowners insurance No. 94–83–31 for alleged damages occurring to [McEwing's] premises on or about December 17, 2009.

2. The Court committed an error of law by failing to find that the competent evidence of record established that the alleged damages occurring at [McEwing's] subject premises on or about December 17, 2009 were caused solely by the intrusion of groundwater for which there was an applicable exclusion from coverage contained in the subject policy of homeowner's insurance no. 94–83–31.

3. The Court committed an error of law in permitting [McEwing's] Engineering Expert, Larry J. Hughes, P.E., to testify at trial despite [Lititz's] objections to such testimony at trial and despite the presentation of a Motion to Strike such testimony by [Lititz] on the basis that Mr. Hughes was not qualified to render testimony in this case and/or lacked adequate foundation upon which to render such testimony.

4. The Court committed an error of law in permitting [McEwing's] pub-

---

4. It is well-established that "[a]ppeals to this Court are usually permitted only after entry of a final judgment .... [a]n appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order de-

nying post-trial motions." *Ruspi v. Glatz*, 69 A.3d 680, 2013 PA Super 131 (Pa.Super. filed May 24, 2013) (quoting *Raheem v. Univ. of the Arts*, 872 A.2d 1232, 1234 n. 2 (Pa.Super.2005)).

lic adjuster, Ken Korger to testify [despite Lititz's] objections to such testimony at trial and despite the presentation of a Motion to Strike such testimony by [Lititz] on the basis that Mr. Korger was not qualified to render testimony in this case and/or lacked adequate foundation upon which to render such testimony.

1925(b) statement.

We review challenges to the verdicts entered in non-jury trials according to the following standard:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*J.J. DeLuca Co., Inc. v. Toll Naval Associates,* 56 A.3d 402, 410 (Pa.Super.2012) (quoting *Rissi v. Cappella,* 918 A.2d 131, 136 (Pa.Super.2007)).

The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, "unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Fudula v. Keystone Wire & Iron Works, Inc.,* 283 Pa.Super. 502, 424 A.2d 921, 927 (1981).

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after

hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Miller v. Sacred Heart Hosp.,* 753 A.2d 829, 832 (Pa.Super.2000) (internal citations omitted). "To the extent that the trial court's findings are predicated on errors of law, we review the court's findings de novo." *John B. Conomos, Inc. v. Sun Co., Inc. (R & M),* 831 A.2d 696, 704 (Pa.Super.2003), appeal denied, 577 Pa. 697, 845 A.2d 818 (2004).

*Weston v. Northampton Pers. Care, Inc.,* 62 A.3d 947, 955 (Pa.Super.2013) (quoting *Hart v. Arnold,* 884 A.2d 316, 331 (Pa.Super.2005)).

In an action arising under an insurance policy, our courts have established a general rule that "it is a necessary prerequisite ... for the insured to show a claim within the coverage provided by the policy." *Betz v. Erie Ins. Exch.,* 957 A.2d 1244, 1256 (Pa.Super.2008) (citing *Miller v. Boston Ins. Co.,* 420 Pa. 566, 218 A.2d 275, 278 (1966)). However, "[w]here an insurer relies on a policy exclusion as the basis for its denial of coverage ..., the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense." *Spece v. Erie Ins. Grp.,* 850 A.2d 679, 682 (Pa.Super.2004) (quoting *Madison Construction Co. v. Harleysville Mutual Ins. Co.,* 557 Pa. 595, 605, 735 A.2d 100, 106 (1999)).

Although Lititz claimed in its 1925(b) statement that the trial court erred in entering a verdict in favor of McEwing when the evidence did not show there was coverage under McEwing's homeowners' policy, Lititz failed to include a section in its appellate brief in which it developed this argument with citation to

relevant legal authority and corresponding analysis. "[W]here an appellate. brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *Umbelina v. Adams,* 34 A.3d 151, 161 (Pa.Super.2011) (citation omitted). Although Lititz contends McEwing should be denied coverage based on the groundwater exclusion, it did not claim that McEwing failed to show her damage was caused by a named peril covered by her policy.[5] We find this portion of Lititz's claim to be waived on appeal.

■■■ However, Lititz does argue that McEwing "failed to establish, as a matter of law, by sufficient evidence that [the groundwater] exclusion is not applicable to [McEwing's] claim for coverage." Lititz's Brief, at 9. We find that Lititz, as the insurer, has the burden to establish its affirmative defense based on a policy exclusion. *See Spece,* 850 A.2d at 682. To support its denial of coverage, Lititz relies on the policy's exclusion for damage caused by groundwater, which the policy defines as "[w]ater below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool, or other structure." Policy, Form HO00030491, at 9.

During trial, Lititz's expert engineer, Lamina, offered two theories on how groundwater caused the deterioration of the joists in McEwing's home: (1) groundwater levels reached the level of the joists and (2) groundwater seeped through the block foundation walls. However, the trial court found that "there was no evidence to support [Lititz's] claim that the repeated entry of groundwater into the crawlspace, coming into contact with the supporting wood joists through direct contact, indirect contact and by wicking up and through the CMU foundation walls and supporting piers was the cause of the damage." Trial Court Opinion (T.C.O.), 11/5/12, at 3. The

---

**5.** We note that Lititz indirectly suggests in another portion of its brief that McEwing's claim did not fall within her policy's coverage because the damage to her home did not constitute a "collapse" or a partial collapse as defined by the policy. However, McEwing did not present the collapse endorsement as the sole provision under which she claimed coverage under her policy; McEwing also claimed she was entitled to coverage under the endorsement providing extended coverage for "fungi, wet or dry rot, or bacteria." N.T. 5/5/12, at 55–60. Lititz does not challenge McEwing's claim for coverage under this endorsement to the policy.

Moreover, Lititz repeatedly conceded that its denial of coverage was solely based on the groundwater exclusion, and did not challenge McEwing's claim for coverage under the collapse provision or the endorsement, as evidenced by the following discussion at trial:

[Trial Court:] Is there any dispute as to whether the floors fell and whether there was a separation?

[Counsel for Lititz:] We are not contending that, Your Honor. There was a drop of the floor of three or four inches.

[Trial Court:] So putting that aside, your refusal to pay on this is based on Section 1 Exclusions and c. water damage?

[Counsel for Lititz:] Yes, Your Honor; the exclusion concerning subsurface water as the cause for this rotting of the joists and *subsequent collapse* due to the deteriorating condition of the joists over a number of decades.

N.T. Trial, 5/9/12, at 25 (emphasis added). When McEwing's attorney referred to the collapse provision, Lititz's counsel reaffirmed that its defense to the action was centered on the groundwater exclusion and expressly stated that "collapse is not an issue in this case." N.T. Trial, 5/9/12, at 58–60; N.T. Trial 5/15/12, at 96–97. Lititz's counsel has consistently argued that "regardless of what section of the policy under which [McEwing] makes claim for coverage, *such choice is irrelevant* because of the clear and unambiguous water exclusion contained in such policy." Lititz's Brief, at 21 (emphasis added).

trial court found Lamina's testimony to be "completely incredible" and rejected his conclusions. *Id.* With respect to Lamina's claim that groundwater had infiltrated the crawlspace and risen to the level of the joists, the trial court made the following findings which were supported by the testimony of McEwing's expert engineer, Larry Hughes:

> if there had been as much water [in the crawlspace] as [Lamina] suggested, the wooden access door would have broken under the pressure, water would have come through the heating ducts, and the blower for the heater would have been destroyed. Additionally, there was a vent through which water would have escaped which was eight inches lower than the joist which was damaged.

T.C.O., 11/5/12, at 3.

Although Lamina had claimed that on his first attempt to inspect McEwing's home, the water level in the crawlspace was so high that he would "probably drown" if he attempted to access it, he did not take any pictures of this alleged condition. N.T. Trial, 5/15/12, at 50–51. McEwing's adjuster, Walter Clark, disputed this claim as he claimed there was no evidence of standing water in the crawlspace on Lamina's first visit. Clark contended that Lamina rescheduled the inspection as he was not dressed appropriately to access the crawlspace. N.T. Trial, 5/9/12, at 51.

Moreover, the trial court also discredited Lamina's theory that water reached the joists by permeating the cinder block foundation walls through the wicking process as "there was no evidence of deteriorating mortar between the CMU, clay or dirt stains, evidence of floating debris, or standing water." T.C.O., 11/5/12, at 3. Overall, the trial court found absolutely no evidence of water having existed in the crawlspace. The trial court found McEwing presented credible evidence and accepted the testimony of her expert witness, engineer Larry Hughes. Based on Hughes's testimony, the trial court concluded that "the only way the home could have been damaged in this manner was through humidity, which is not an exclusion under [McEwing's] homeowner's policy." T.C.O., 11/5/12, at 3.[6]

Further, Lititz claims our decision in *Kozlowski v. Penn Mutual Insurance Company*, 295 Pa.Super. 141, 441 A.2d 388 (1982), requires us to find the groundwater exclusion bars McEwing from coverage under her policy. In *Kozlowski*, this Court found that water damage to the insured's basement caused by a burst water main valve in front of a neighbor's home was not a loss covered by the insured's policy which only covered losses caused by water which escaped from the plumbing system on the insured premises. Although the insured's policy contained the same exclusion for water damage as in this case, this Court in *Kozlowski* expressly found it was unnecessary to discuss whether the exclusion was applicable as the damage to the insured's home was not caused by a peril included within the policy's coverage. We fail to see how our holding in *Kozlowski* is relevant to this case and Lititz failed to develop any further analysis on this point.[7]

---

6. To the extent that Lititz suggests that the language of the groundwater exclusion should be construed to include damages caused by humidity, we find this issue waived for lack of development. Lititz makes passing references to this claim in other portions of its appellate brief, but never supports this argument with citation to legal authority or subsequent analysis. *See Umbelina,* 34 A.3d at 161.

7. Lititz also cites to *Colella v. State Farm Fire and Casualty Co.,* 407 Fed.Appx. 616 (3rd Cir.2011) (unpublished opinion), in which the U.S. Court of Appeals for the Third Circuit

Accordingly, when viewing the record in the light most favorable to McEwing as verdict winner, we find the trial court's factual determinations are supported by competent evidence and we will not disturb its credibility findings on appeal. *See Weston,* 62 A.3d at 955. We find that the trial court did not err in entering judgment for McEwing when Lititz failed to prove that the groundwater exclusion applied in this case to bar McEwing from recovering under the policy.

■ Lititz also contends the trial court abused its discretion in allowing McEwing's witnesses, Larry Hughes, P.E., and Ken Korger, to testify without proper qualification or adequate foundation for their testimony. "The admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent a clear abuse of discretion." *Hatwood v. Hosp. of the Univ. of Pennsylvania,* 55 A.3d 1229, 1239 (Pa.Super.2012) (quoting *Helpin v. Trustees of Univ. of Pennsylvania,* 969 A.2d 601, 617 (Pa.Super.2009)).

■ First, Lititz appears to argue that Hughes was not qualified to testify even though he is a mechanical engineer and a certified construction inspector for residential buildings. Lititz never objected to Hughes's qualifications as an expert witness during *voir dire* or any point at trial; the first time Lititz raised this issue was in its Motion for Post–Trial Relief. Our Rules of Evidence provide that when a litigant challenges the admission of evi-

dence, the issue is preserved if there is "a timely objection, motion to strike or motion in limine stating the specific ground of objection." Pa.R.E. 103(a)(1). As Lititz did not preserve this issue by making a contemporaneous objection to Hughes's qualification as an expert at trial, we find this issue waived on appeal.

■ Lititz also argues that Hughes based his expert opinion on facts which were not supported by the evidence of record. Specifically, Lititz claims that when Hughes inspected the crawlspace after Reardon temporarily repaired the wooden joists, Hughes did not specifically inspect the sill plates which the joists rested on in the crawlspace and admitted that he did not view the home's roof or attic. Lititz points out that Hughes never documented in his report that he inspected the fan, furnace, or wiring in the crawlspace. Further, Lititz challenges Hughes's conclusions about the damaged joists as Hughes neither made any measurements or structural calculations nor used any equipment or a building code to support his claims.

Pennsylvania Rule of Evidence 703 sets forth the proper bases of an expert's opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts

found that damage to an insured's home caused by a sewage pipe that ran under the insured's home. We are not bound by decisions of the federal courts, but we may rely on them for persuasive authority. *Cresci Const. Servs., Inc. v. Martin,* 64 A.3d 254, 259 (Pa.Super.2013) (citation omitted). Nonetheless, *Colella* can be distinguished from this

case as the policy in that case contained an expansive lead-in clause to the exclusionary section which stated that State Farm did not insure for such groundwater damage "regardless of ... the cause of the excluded event." Such an expansive clause does not appear in the policy in this case.

or data need not be admissible in evidence.

Pa.R.E. 703. Further, our Court has explained under what circumstances the testimony of an expert witness will be deemed incompetent:

[E]xpert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Gillingham v. Consol Energy, Inc.,* 51 A.3d 841, 849 (Pa.Super.2012) (quoting *Helpin v. Trustees of University of Pennsylvania,* 969 A.2d 601, 617 (Pa.Super.2009) (citation and quotation marks omitted)).

As noted above, Hughes was qualified and admitted, without objection, as a professional engineer and a certified construction inspector with respect to residential homes. N.T. 5/9/12, at 97. Although Hughes documented his inspection of McEwing's home with photographs after Reardon had completed the renovations, Hughes also reviewed photographs that had been taken before the repairs had been made and spoke to McEwing's son-in-law, Reardon, about the extent of the damage and the temporary repairs. Hughes inspected the damage to the interior of the home and personally inspected the crawlspace beneath the home. When Hughes accessed the crawlspace to inspect the deteriorated joists, he discovered that Reardon had replaced the broken joists but observed that parts of the remaining joists were still rotted.

Hughes testified from personal observation that there was no evidence that water had filled the crawlspace or had permeated the concrete block. Hughes based his opinion on a number of facts, including: (1) there was no evidence of standing water, (2) the crawlspace contained dust, woodchips, and other debris that had not been contacted by water, (3) there was no deterioration of the mortar between the CMU or clay or dirt stains on the CMU, and (4) there was no water damage to the furnace, wires, or heating ducts. Although Hughes did not inspect the furnace and electrical connections in the crawlspace, it is reasonable to conclude that the heating system was functional at the time of the inspection in the winter when neither McEwing nor Reardon reported any problems with it. We do not see how Hughes' failure to inspect the home's attic or roof prevented him from determining how the home's supporting joist system collapsed.

Further, Hughes was able to conclude that the joists deteriorated as a result of high levels of humidity and moisture in the crawlspace over an extended period time as he noted the crawlspace was dark, damp, and humid due to the lack of proper ventilation. We find no support for Lititz's broad claim that Hughes was required to use specialized equipment and make specific citations to a building code to support his claim. Hughes based his expert opinion on his experience as a certified construction inspector and his personal observations during his inspection of McEwing's home. As Hughes's expert opinion had an adequate basis in fact, Lititz's claim that the trial court erred in denying his motion to strike Hughes's expert testimony is meritless.

In addition, Lititz contended the testimony of public adjuster Ken Korger was incompetent as it was speculative and lacked an adequate factual basis. Lititz points out that even though Korger inspected the damage to the interior of the

home and looked into the crawlspace to observe the damage, Korger did not enter the crawlspace and relied on information from Reardon, McEwing's son-in-law who completed the temporary repairs to the home. Korger admitted that he did not review the expert report of engineer Hughes.

Based on his observations of the damage and the information given to him by Reardon, Korger prepared an estimate of the costs necessary to raze the home, repair the decayed structural support of the home, and to replace the structure. Korger admitted that he prepared a revised estimate in response to suggested revisions of Francis Beck, Lititz's adjuster. Korger testified on direct examination that his amended estimate of the cost to return McEwing's home to pre-loss condition was $90,729.64. When engineer Hughes subsequently testified, he did not disagree with Korger's recommendation to raze the home but felt such a decision should be left to the contractor doing the repairs. Hughes opined that it might be more financially prudent for a contractor to attempt to jack up the floor joists to remove the rotted sills without razing the home, but recognized that there was a risk of cracking the dry wall and misaligning the home by using this method of repair.

 Even if we assume that the trial court erred in refusing to strike Korger's testimony, Lititz has not shown that the error prejudiced its defense in any way. "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 101 (Pa.Super.2011). Although the trial court refused to strike Korger's testimony, it did not accept his estimate to raze the home, which may not have been the most reasonable, necessary, or cost-effective method to return McEw-

ing's home to its pre-loss state. Instead, the trial court entered a verdict in favor of McEwing for $30,000.00, which is significantly less than Korger's estimate. As Lititz failed to show how the admission of Korger's testimony prejudiced its defense, the admission of this evidence would constitute at most, harmless error.

Based on the foregoing analysis, we conclude the trial court did not err in entering judgment in favor of McEwing for the damages to her home. However, we recognize that even though the trial court granted her motion to mold the verdict to include $4,383.87 in prejudgment interest, the trial court inadvertently entered judgment without adding the interest. As a result, we remand for the trial court to add the prejudgment interest to the verdict and to evaluate whether McEwing is entitled to any additional interest which may have accrued.

Case remanded to the lower court for the addition of interest to the verdict in accordance with this opinion. In all other respects, the order of the lower court is affirmed.