J-A17041-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| 88 REALTY, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZOOM TAN, INC. | : | |
| | : | |
| Appellant | : | No. 1111 WDA 2024 |

Appeal from the Judgment Entered October 2, 2024
In the Court of Common Pleas of Erie County Civil Division at No(s): No. 2020-10022

BEFORE:  McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: SEPTEMBER 11, 2025**

Zoom Tan, Inc. ("Zoom Tan") appeals from the judgment entered in the Court of Common Pleas of Erie County on October 2, 2024, against Zoom Tan and in favor of 88 Realty, LLC ("88 Realty"), in this landlord-tenant dispute arising out of a commercial lease.[1]  After careful review, we affirm.

On January 31, 2020, 88 Realty filed a complaint against Zoom Tan, alleging breach of contract and seeking monetary damages.  ***See*** Complaint, 1/31/20, at 1-3.  Zoom Tan filed an answer and new matter, and a non-jury

---

[1] Zoom Tan purports to appeal from the order dated August 15, 2024, denying its post-trial motion for relief; however, an appeal properly lies from the entry of judgment following the trial court's disposition of post-trial motions.  ***See Fanning v. Davne***, 795 A.2d 388 (Pa. Super. 2002).  Although Zoom Tan erroneously appealed from the order denying it post-trial relief, judgment was subsequently entered on October 2, 2024, and its notice of appeal relates forward to that date.  ***See*** Pa.R.A.P. 905(a)(5).  Hence, no jurisdictional defects impede our review.  We have adjusted the caption accordingly.

trial was scheduled for December 8, 2023. Following the trial, both parties submitted proposed findings of fact and conclusions of law. Subsequently, "to ensure that the [c]ourt was correct with certain factual matters, [it] conducted a supplemental oral argument on April 19, 2024[,] with counsel." Findings and Verdict of the Court ("Trial Court Findings"), 4/26/24, at 1.

After reviewing all the parties' pleadings and exhibits, as well as its notes from the non-jury trial and the supplemental argument, the trial court issued the following findings:

> On July 18[,] 2013, … 88 Realty … entered into a lease with Zoom Tan … whereby the landlord, 88 Realty, leased property [("the "Demised Premises")] located at 6803 Peach Street, Erie, PA[,] to Zoom Tan. The parties entered into a 38-page written commercial lease agreement, and subsequent to that lease, Zoom Tan used that property to operate an indoor tanning salon. **See** [Joint Stipulation of Documents, 7/23/24, at Exhibit 1 ("Lease Agreement")].[2]
>
> One amendment to the lease was executed on November 20, 2018. That addendum reduced the monthly rental payment from $3,400 a month to $2,000 a month, and further modified the lease to be a month-to-month lease beginning February 1, 2019.
>
> Pursuant to the terms of the initial commercial lease agreement, Zoom Tan agreed to keep and maintain the property's condition during the lease term and also upon expiration of the lease. Specifically, the lease indicated that, upon the termination, Zoom Tan would cause the property … "to be [in as] good condition and repair as the same were in at the time of delivery [of] possession,

---

[2] Pursuant to the terms of the lease, Zoom Tan completed the build-out of the shell space to create a finished space for its patrons, which included various improvements to the Demised Premises, such as painting the walls, installing vinyl floors, and connecting two HVAC units. **See** Zoom Tan's Brief at 5; 88 Realty's Brief at 4.

or may have been put in prior to the surrender, whichever is better in the opinion of the landlord." [] Lease Agreement at [§] 13.

In April of 2019, Zoom Tan surrendered the property in accordance with the [L]ease [A]greement. That surrender was testified to by both Drew Baldwin from 88 Realty and Tony Toepfer on behalf of Zoom Tan.

After Zoom Tan vacated the premises, 88 Realty sent correspondence dated May 23, 2019, and provided an itemized move-out billing.[3]

Subsequent to being notified that 88 Realty would be seeking damages resulting from 88 Realty's opinion of the property after it had been vacated, Zoom Tan requested that it be permitted to go back onto the property to try to address the damage issues which 88 Realty had raised.

The parties remained in dispute as to what items were damaged, the overall state of the premises, and whether the repairs attempted by Zoom Tan subsequent to vacating the property were sufficient.

Zoom Tan avers that it "left the property in ideal condition for the subsequent tenant." … Zoom Tan['s] … Proposed Findings of Fact and Conclusions of Law[, 1/19/24,] at ¶ 23. 88 Realty contends that "the walls and floor were in worse condition then they were prior to surrender by Zoom Tan. When Zoom Tan first operated, the floors were not stained and the walls did not have visible patching." 88 Realty['s] … Proposed Findings of Fact and Conclusions of Law[, 2/5/24,] at ¶ 20. 88 Realty also contends that it had to repair the HVAC system.

In July 2020, 88 Realty was able to lease the subject property to Pita john, LLC[, ("Pita Pit"),] for a term of ten years at an initial rate of $2,300 a month. Pita [Pit's] rent was $900.00 less a month than the initial long[-]term rent paid by Zoom Tan, but was $300.00 more than [Zoom Tan] was required to pay when the

_____

[3] The "move-out billing" correspondence dated May 22, 2019, notified Zoom Tan that 88 Realty was seeking damages totaling $13,545.64, due within 10 days of the date of the letter. Joint Stipulation of Documents at Exhibit 4 (single page). Said amount included damages for, *inter alia*, HVAC repair, electric repairs, doors/windows, patch prime paint, and flooring replacement. *Id.*

Zoom Tan addendum was executed, and the lease became a month-to-month agreement.

The [c]ourt hereby finds that 88 Realty has met is [*sic*] burden of proof that Zoom Tan did breach the written commercial lease agreement which required it to keep the commercial property in good condition and to ensure that when it was vacated, … that it was, "to be in as good condition and repair as the same were in at the time of delivery of possession, or may have been put in prior to the surrender, whichever is better in the opinion of the landlord." [] Lease Agreement at [§] 13….

Trial Court Findings at 1-3 (some citations to record omitted).

In light of its finding that Zoom Tan breached a material term in the contract, the trial court entered judgment in favor of 88 Realty, awarding 88 Realty damages in the amount of $8,285.39,[4] plus interest on the damages at 18% from June 2, 2019 to December 8, 2023, and from the date of the verdict going forward. *Id.* at 7. Additionally, it awarded 88 Realty attorney's fees and costs in the amount of $21,783.55. Molded Verdict Order, 8/15/24, at 1 (single page).[5]

---

[4] The total damages award in the amount of $8,285.39 includes reimbursements for $923.00 spent to repair the HVAC system and $3,185.16 spent on painting, as well as compensation in the amount of $4,177.23 for damage to the floors. *See* Trial Court Findings at 4.

[5] The verdict issued on April 26, 2024, awarded $20,181.55 in attorney's fees and costs. *See* Trial Court Findings at 7. However, on August 15, 2024, the trial court granted 88 Realty's motion to mold the verdict and amended the award of attorney's fees and costs to include an invoice dated December 5, 2023, for $1,602.00, that the trial court had initially overlooked. *See* Molded Verdict Order at 1 (single page). For consistency purposes, we have amended Zoom Tan's references to attorney's fees herein to reflect the molded verdict amount.

Zoom Tan filed a timely motion for post-trial relief, which was denied by the trial court on August 15, 2024. It then filed a notice of appeal from that August 15, 2024 order, after which this Court issued a rule to show cause as to why this appeal should not be dismissed, as no final judgment had been entered in this case. *See Per Curiam* Order, 9/19/24, at 1 (single page) (citing ***Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995) ("Appeal lies from the judgment entered subsequent to the trial court's disposition of any post-verdict motions.")). Zoom Tan responded, providing a copy of the docket which indicated that a judgment was entered on October 2, 2024. Accordingly, we discharged the rule to show cause and directed that the appeal shall proceed. *See Per Curiam* Order, 10/3/24, at 1 (single page).

On October 10, 2024, Zoom Tan filed a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. In compliance with Rule 1925(a), the court then issued an order stating that the issues raised by Zoom Tan have been fully addressed in its Findings and Verdict and therefore no further opinion is necessary. Order, 10/21/24, at 1 (single page).

On appeal, Zoom Tan presents the following questions for our review:

1. Did the trial court err when it granted 88 Realty $8,385.39 in property damages for purported breach of a commercial lease agreement when Zoom Tan returned the subject premises to 88 Realty at the end of the lease term in better condition than Zoom Tan received it at the beginning of the lease term?

2. Did the trial court err when it granted 88 Realty attorney's fees and costs for $2[1,783].55?

3. Did the trial court err when it awarded 88 Realty $6,741.80 in pre- and post-judgment interest?

Zoom Tan's Brief at 4.

Preliminarily, we note our standard of review:

> When reviewing the verdict from a bench trial, we must review the evidence of record in the light most favorable to the verdict winner to determine whether competent evidence supports the trial court's findings and whether it erred in reaching its conclusions of law. *McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa. Super. 2013). We afford the same weight to the trial court's findings of fact as we do a jury's verdict. *Id.* We will only reverse if the trial court's findings of fact are unsupported by competent evidence or if it erred as a matter of law. *Id.*

*Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 652 (Pa. Super. 2014).

Additionally, we recognize that a lease is a contract and is to be interpreted according to contract principles. *Mace v. Atlantic Refining Mktg. Corp.*, 785 A.2d 491, 496 (Pa. 2001). The interpretation of a contract is a question of law and our scope of review is plenary. *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509 (Pa. Super. 2013).

> A fundamental rule in construing a contract is to ascertain and give effect to the intent of the contracting parties. *Shovel Transfer & Storage, Inc. v. P*[*a.*] *Liquor Control Bd.*, … 739 A.2d 133, 137 ([Pa.] 1999) (citation omitted). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Id.* [at] 138. When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone. *Steuart v. McChesney*, … 444 A.2d 659, 661 ([Pa.] 1982). *See J.K. Willison, Jr. v. Consolidation Coal Co.*, … 637 A.2d 979, 982 ([Pa.] 1994) (contract terms must be construed as manifestly expressed by the parties and according to the accepted and plain meaning of the language used by the parties).

*Mace*, 785 A.2d at 496; *see also Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. 2002) ("In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.").

Instantly, Zoom Tan claims that the trial court erred in finding that it breached the Lease Agreement, and therefore requests that we vacate the entire verdict in favor of 88 Realty. Zoom Tan's Brief at 4, 12. It contends that the trial court based its decision on "a fundamental misinterpretation of the [l]ease." *Id.* at 12. According to Zoom Tan:

> Section 13 of the Lease [Agreement] provides that Zoom Tan would return the Demised Premises back to [the] landlord in the original condition it was delivered in or its condition prior to surrender, whichever is better in the opinion of 88 Realty. That is, 88 Realty could choose between the condition of the premises upon its original delivery to Zoom Tan at the beginning of the lease term (*i.e.*, an empty shell with concrete floors) or its condition prior to surrender at the end of the lease term (*i.e.*, an improved space built out by Zoom Tan, including installed flooring, **with wear and tear**).

*Id.* (emphasis added). Zoom Tan contends that it made improvements to the Demised Premises upon delivery of possession and then surrendered the property in its "improved condition with some normal wear and tear[,]" in compliance with Section 13 of the Lease Agreement. *Id.* at 15-16. Nonetheless, Zoom Tan avers that the trial court essentially held, "Zoom Tan was required [to] return the Demised Premises in its best possible condition that occurred right after Zoom Tan's buildout, without any wear and tear."

*Id.* at 15. It argues that "[n]othing in Section 13 supports the trial court's conclusion." *Id.* We disagree.

Because our goal is to effectuate the intention of the parties, we turn to the plain language of the Lease Agreement, which states in pertinent part:

13. Surrender of Demised Premises

Tenant shall surrender to Landlord possession of the Demised Premises upon the expiration of this Lease, its earlier termination, or as otherwise provided in this Lease. "Surrender" means Tenant shall vacate the Demised Premises, deliver the keys to Landlord, and cause the Demised Premises to be in **as good condition and repair as the same were in at the time of delivery of possession of the Demised Premises or may have been put in prior to the surrender, whichever is better in the opinion of the Landlord**. Nothing in this clause shall relieve Tenant of its obligations under this Lease. Tenant's obligations under this clause shall survive this Lease.

Lease Agreement at § 13 (emphasis added).

Additionally, the lease provides: "Landlord and Tenant agree that the construction and improvements of the Demised Premises shall be done as described in Exhibit 'B' attached hereto and made a part hereof." *Id.* at ¶ 2. Exhibit "B" requires 88 Realty to provide Zoom Tan with "shell plans for the Building[,]" *id.* at Exhibit "B" at § A ¶ 2, after which it states that Zoom Tan shall provide 88 Realty with:

[S]chematic and conceptual interior layout plans (based on Landlord's Shell Plan) for the Demised Premises showing:

(i) the desired location of Tenant's interior partitions;

(ii) general information showing Tenant's desired store design and trade fixture layout;

> (iii)     plumbing lines or fixtures (as may be required by Tenant in addition to any plumbing and electrical system shown on Landlord's Shell Plans);
>
> (iv)     electrical requirements, including the location of convenience receptacles and the "load" of any fixtures or equipment to be installed by Tenant or operated in the Demised Premises;
>
> (v)     ceiling and light fixture layout; and
>
> (vi)     any other pertinent information relating to the construction of the Demises Premises.

*Id.* at Exhibit "B" at § A ¶ 3.

Section B of Exhibit "B" describes in detail the work to be performed on the Demised Premises by 88 Realty. ***See generally id.*** at Exhibit "B" at § B. Section C, entitled "Work By Tenant," states:

> Any additional work required to finish the construction of the Demised Premises other than the work to be provided by Landlord as specifically set forth above shall be the complete responsibility and expense of Tenant, including, but not limited to: drop ceiling, interior walls, flooring, doors, HVAC duct work and controls, electrical work, lighting, signs, safety items, connections/conduits to, and wiring for, Tenant's furnishings, fixtures and equipment, communication lines, cable systems, controls, conduit, telepoles, connections and service; any electrical work necessary, interior buzzer systems, customer service bell, sound and intercom systems, recording units, etc.; computer and/or point-of-sale equipment, time clocks, security system, communication systems and energy management systems that may be required; including all wiring for same.

*Id.* at Exhibit "B" at § C ¶ 1.

Based on the foregoing, it is clear that the parties intended for Zoom Tan to complete the build-out of the shell space, which would include Zoom Tan's making improvements to the Demised Premises. Moreover, they agreed that 88 Realty could choose to demand surrender of the Demised Premises in

as good condition as it "may have been put in prior to the surrender[.]" ***Id.*** at § 13; ***see also*** Trial Court Findings at 3 (finding that Zoom Tan specifically agreed to the language in Section 13 of the Lease Agreement, "thereby providing the landlord with discretion as to 'whichever is better'"). Significantly, we note the parties could have chosen to include language in Section 13 which would except reasonable wear and tear; however, they chose not to do so.[6, 7] "[W]e will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used." ***Profit Wize Mktg.***, 812 A.2d at 1274-75. Thus, viewing the evidence in a light most favorable to 88 Realty as the verdict winner, we conclude the plain language of the Lease Agreement supports the trial court's determination that Zoom Tan was

---

[6] For instance, Section 12 of the lease requires 88 Realty to "keep and maintain, at its own cost and expense, the roof, the plumbing, sewage, and utility lines serving the Demised Premises but located beyond the exterior walls of the Demised Premises …, and the structural system and exterior walls of the Demised Premises, **reasonable wear and tear excepted**…." Lease Agreement at § 12 (emphasis added).

[7] To the extent that Zoom Tan asserts, "a provision for returning the premises in as good condition as received, **ordinary wear and tear excepted**, includes that usual deterioration which results from the day-to-day use of the premises and from lapse of time[,]" Zoom Tan's Reply Brief at 6-7 (quoting 49 Am. Jur. 2d Landlord and Tenant § 713) (emphasis added), we deem this argument inapplicable to the instant matter because Section 13 of the Lease Agreement does not include a provision excepting ordinary wear and tear. ***Cf Platt v. City of Philadelphia***, 133 A.2d 860, 862 (Pa. Super. 1957) (refusing to imply a limitation 'excepting reasonable wear and tear' where it is not found in the lease, stating: "Where the parties have by their express contract not limited their obligation, the law will not imply a limitation.").

- 10 -

required to return the property in a state equivalent to that which the property was in after completion of the build-out and without wear and tear.

Alternatively, Zoom Tan claims that even if it breached the terms of the lease, the trial court erred in its calculation of the damages, attorney's fees, and interest awarded to 88 Realty. ***See generally*** Zoom Tan's Brief at 17-23. First, it argues that the trial court's finding of damages in the amount of $8,385.39, "is contrary to the evidence of record because there was no testimony that 88 Realty ever expended any amount for such repairs." ***Id.*** at 17; ***see also id.*** at 19 (asserting that the trial court erred in awarding 88 Realty damages for "work that was never performed"). Rather, it contends that "88 Realty's new commercial tenant (Pita Pit) leased the Demised Premises at full rent with no offset for its purportedly defective condition." ***Id.*** at 17-18; ***see also id.*** at 18 ("Zoom Tan only removed non-fixtures, such as tanning booths and beds and left the Demised Premises in ideal condition for the subsequent tenant."). Moreover, it claims that the trial court failed to take into account "subsequent work performed by Zoom Tan when it re-entered the Demised Premises." ***Id.*** at 19. We are not convinced that any relief is due on this claim.

"It is beyond cavil that breach of contract damages are intended to place the non-breaching party nearly as possible in the same position it would have occupied had there been no breach." ***Vinculum, Inc. v. Goli Techs., LLC***, 310 A.3d 231, 249 (Pa. 2024) (cleaned up). Here, 88 Realty asserts that "had Zoom Tan not breached the lease[, it] would have regained possession of the

[p]roperty with functioning HVAC units, painted walls[,] and a floor that was not stained." 88 Realty's Brief at 17. Hence, it contends that it presented evidence at trial of "the repairs needed to put the [p]roperty into the requisite condition[,]" which totaled $8,385.39. *Id.*

Additionally, the trial court opined:

> Although witnesses for Zoom Tan did testify as to their understanding that the HVAC system was not in need of repair, the [c]ourt finds that 88 Realty has proven that the $923.00 spent for replacement parts was necessary; and therefore, Zoom Tan is responsible for that cost.[8] The [c]ourt also notes that Zoom Tan presented evidence that it patched walls, removed cork boards, *etc.*, when it was permitted to temporarily re-enter with … 88 Realty's permission. However, the [c]ourt's review of testimony and supporting documents/photos requires it to also award $3,185.16 for painting. The [c]ourt acknowledges "Footnote 2" of … 88 Realty's Proposed Findings that it is not now seeking the $1,729.80 for patching work.[9]

---

[8] ***See*** Joint Stipulation of Documents at Exhibit 13 ("Affidavit of Mark Patrizia") at ¶ 1 (Mr. Patrizia's declaring that he is the custodian of records for Rabe Environmental Systems, Inc. ("Rabe")); ***id.*** at Exhibit 1 (including Rabe's service order dated July 23, 2019, estimating $923.00 for the replacement of 3 parts, as well as a Rabe invoice dated August 8, 2019, reflecting a total due of $923.00).

[9] ***See*** 88 Realty's Proposed Findings of Fact and Conclusions of Law at 6 n.2 ("There is no dispute that Zoom Tan never painted the [p]roperty. However, it did patch holes in the walls (even though the work was subpar). Because the repair estimate from Armor Property Maintenance [("Armor")] did not take into account Zoom Tan's attempts to address these issues, 88 Realty is not seeking recovery of $1,729.80 for patching work. ***See*** Exhibit 15."); ***see also*** Joint Stipulation of Documents at Exhibit 15 ("Affidavit of Robert Blinzler") at ¶ 1 (Mr. Blinzler's stating that he is the custodian of records for Armor); ***id.*** at Exhibit 1 (Armor's proposal reflecting separate estimates to "[p]atch 133 anchor holes in drywall" ($1,729.80) and to "[p]rime and paint 2 coats on approximately 2,508 square feet of wall space" ($3,185.16)).

With regard to the claim of $4,177.23 for "Flooring Replacement," this was one of the issues addressed in the supplemental argument of April 19, 2024. The [c]ourt wanted to verify its specific understanding that floors were not replaced. Counsel for each party confirmed that[ fact]. The record also supports a determination that the subsequent tenant, Pita [Pit,] paid a rental rate which was not reduced specifically because of the condition of the floors (which were clearly marked up and discolored[).] Therefore, the issue is whether the $4,177.23 should be awarded where the invoice is specific and evidence exists that the floors were damaged during Zoom Tan's tenancy, even though 88 Realty did not have to actually spend $4,177.23 to repair them.

The [c]ourt finds that it is not a "windfall" to award $4,177.23 to [88 Realty] even though that amount was not paid by [them]. Zoom Tan caused the damage, and it is not unreasonable nor speculative to say that 88 Realty may choose to repair the floor even while Pita [Pit] is a tenant or if Pita [Pit] vacates the premise for any reason. Testimony from 88 Realty's representative indicated that it chose not to repair the floor during this litigation as opposed to not believing it needed repaired/replaced. Therefore, $4,177.23 is also awarded to … 88 Realty.

Trial Court Findings at 4-5 (citations to record omitted). Based on our review, we conclude that there is competent evidence in the record to support the damages awarded by the trial court, and we discern no error of law.

Next, Zoom Tan argues that the trial court erred in awarding 88 Realty attorney's fees and costs in the amount of $21,783.55, as it claims the trial court failed to consider the factors set forth in *In re LaRocca's Trust Estate*, 246 A.2d 337 (Pa. 1968), for determining a reasonable award of attorney's fees. Zoom Tan's Brief at 20-21. Those factors include:

[T]he amount of work performed; the character of the services rendered; the difficulty of the problems involved, the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able

- 13 -

to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*LaRocca's Trust Estate*, 246 A.2d at 339. However, aside from listing the *LaRocca* factors, Zoom Tan fails to provide any meaningful discussion whatsoever of how the factors apply to this case or why the attorney's fees and costs are unreasonable. Instead, it merely avers that "the trial court made no reference to these factors, simply stating that $2[1,783].55 for attorney's fees is reasonable because counsel provided invoices with billable rates." Zoom Tan's Brief at 22.

Consequently, we deem this claim waived. "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002); *see also* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part … the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.). "Without a reasoned discussion of the law…, our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for the appellant." *Estate of Haiko*, 799 A.2d at 161 (cleaned up).

Nevertheless, even if Zoom Tan had not waived this claim, no relief would be warranted. "[T]he reasonableness of the fee is a matter of sound discretion of the lower court and will be changed by an appellate court only

when there is a clear abuse of discretion." ***LaRocca's Trust Estate***, 246 A.2d at 339 (cleaned up). This Court has previously explained:

> We have a limited power for review of court awarded fees. As the Supreme Court has so frequently stated, the responsibility for setting such fees lies primarily with the trial court and we have the power to reverse its exercise of discretion only where there is plain error. Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award. The rationale behind this limited scope of review is sound. It is the trial court that has the best opportunity to judge the attorney's skills, the effort that was required and actually put forth in the matter at hand, and the value of that effort at the time and place involved.

***Carmen Enterprises, Inc. v. Murpenter, LLC***, 185 A.3d 380, 390 (Pa. Super. 2018) (citation omitted); ***see also id.*** (stating that the trial court does not have to address every ***LaRocca*** factor).

Instantly, the trial court noted that the Lease Agreement, which was "consensually entered into by both parties[,]" specifically provides:

> The prevailing party shall be entitled to all costs and expenses, including reasonable attorney's fees, court costs and costs of appeals at trial or appellate levels incurred in enforcing the covenants, terms and conditions of the lease and the non-prevailing party shall pay such sums on demand of the prevailing party.

Trial Court Findings at 5 (quoting Lease Agreement at ¶ 24). Moreover, the "wherefore" clause of the Complaint included a demand for "attorney's fees, costs, interest and any other relief...." ***Id.*** (quoting Complaint at 3).

The trial court explained that the parties' Joint Exhibit 29 contains "a summary of the invoices for the costs and legal services incurred, as well as

- 15 -

the specific invoices from [December 4, ]2019 through [September 18, ]2023. It reflects the billable rates for 88 Realty's counsel and associates, and costs." *Id.* It further opined:

> The court only has the discretion to determine if those fees and costs are reasonable. The court will not make any further determination or micromanage the billings. The amounts requested are not unreasonable…. The court acknowledges that those fees are approximately two and one-half times greater than the damages awarded for the property issues, but the Lease Agreement does not limit the award of fees to any certain ratio or amount. Therefore, the verdict shall include: $2[1,783].55 for attorney's fees and costs in favor of 88 Realty. The court finds 88 Realty is not entitled to interest on the attorney's fees.

*Id.* at 6 (cleaned up). As the attorney's fees and costs awarded are supported by competent evidence in the record, we would not discern any abuse of discretion in the trial court's finding that said amount is reasonable.

Finally, Zoom Tan contends that the trial court erred in awarding 88 Realty pre-judgment and post-judgment interest at a rate of 18% per annum. Zoom Tan's Brief at 22. It argues rather that "any such interest should be at the statutory, lawful rate of 6% per annum." *Id.* at 22-23. However, Zoom Tan fails to provide any binding precedent or discussion of legal authority in support of its contention. *See id.*; Zoom Tan's Reply Brief at 11-12. Additionally, Zoom Tan argues that 88 Realty failed to specifically request pre-judgment interest in its complaint and that the trial court erred in calculating pre-judgment interest from June 2, 2019, because it avers that the amount owed to 88 Realty was not established until April 26, 2024, the date of the verdict. Zoom Tan's Brief at 23. Yet again, Zoom Tan fails to provide any

legal authority in support of its position. As such, we are constrained to deem this argument waived. **See also Estate of Haiko**, **supra**; Pa.R.A.P. 2119(a). We will not develop arguments on behalf of the appellant. **Coulter v. Ramsden**, 94 A.3d 1080, 1088 (Pa. Super. 2014).

Even if Zoom Tan had not waived its claim regarding the interest awarded by the trial court, we would conclude that no relief is due. Prejudgment interest is a legal right and begins to run when performance is due, regardless of whether the plaintiff demanded prejudgment interest prior to commencing litigation. **PCA EMStar Holdings, L.P. v. Philadelphia Post-Acute Partners**, 2024 WL 2796993, at *12 (Pa. Super. May 31, 2024) (unpublished memorandum)[10] (citing **Andrews v. Cross Atl. Capital Partners, Inc.**, 158 A.3d 123, 136 (Pa. Super. 2017); **Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.**, 53 A.3d 53, 65 (Pa. Super. 2012); Rest. 2nd. of Contracts § 354(1)). Moreover, we are cognizant that the statutory rate of interest in this Commonwealth is fixed at 6%; however, "in anticipation of non-payment of money due, parties to a contract may stipulate to a higher rate of prejudgment interest." **Pittsburgh Const. Co. v. Griffith**, 834 A.2d 572, 590 (Pa. Super. 2003). Likewise, we have recognized that "[s]tatutory post-judgment interest is a matter of right where damages are ascertainable by computation, even though a *bona fide* dispute exists to the

---

[10] **See** Pa.R.A.P. 126(b) (stating that unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

amount of the indebtedness[,]" and that "parties to a contract may agree to a higher rate." *Id.* at 590-91 (citations omitted).

Instantly, the Lease Agreement provides:

If Tenant shall fail to pay, when the same is due and payable, any Minimum Rent or any Percentage Rent **or other amounts or charges to be paid to Landlord by Tenant as provided in this Lease, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the rate of eighteen percent (18%) per annum.**

Lease Agreement at § 26 (emphasis added). As 88 Realty points out, the amount it was owed by Zoom Tan became due on June 2, 2019, ten days after the May 23, 2019 "move-out billing" letter. *See* 88 Realty's Brief at 23; Joint Stipulation of Documents at Exhibit 4; *see also* Trial Court Findings at 7 (opining that the Complaint seeks interest in its "wherefore" clause and that the language of the Lease Agreement supports the court's determination that pre-judgment interest should be calculated commencing on June 2, 2019). Therefore, the trial court awarded interest at the rate of 18% per annum from June 2, 2019, to December 8, 2023, and for all days after the entry of its verdict. *Id.*; *see also id.* (explaining that "Zoom Tan should not have to pay interest from December 8, 2023[,] to [the date of the verdict,] since both counsel requested to prepare and file their Proposed Findings, and the [c]ourt needed several weeks to render [its] decision"). We would discern no abuse of discretion or error of law in the trial court's decision.

Accordingly, we affirm the judgment entered on October 2, 2024, in favor of 88 Realty and against Zoom Tan.

- 18 -

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>9/11/2025</u>