**NEWMAN DEVELOPMENT GROUP OF POTTSTOWN, LLC, Appellee**

**v.**

**GENUARDI'S FAMILY MARKET, INC., and Safeway, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued April 23, 2014.

Filed Aug. 19, 2014.

Robert L. Byer, Pittsburgh, for appellants.

Thomas A. Riley, Jr., Exton and Jeanette N. Simone, Binghampton, NY, for appellee.

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E., PANELLA, DONOHUE, ALLEN, LAZARUS, MUNDY and OTT, JJ.

OPINION BY DONOHUE, J.:

Genuardi's Family Market, Inc. ("Genuardi's") and Safeway, Inc. ("Safeway") (collectively, "Tenant") appeal from the March 1, 2010 order filed by the Court of Common Pleas, Chester County, following a bench trial in this breach of contract action initiated by Newman Development Group of Pottstown, LLC ("Landlord"). After careful review, we affirm the trial court's decision not to reduce the damages awarded to Landlord to present value,[1] its determination as to the amount of damages to deduct as mitigation, and its grant of contractual interest on the damages beginning on February 13, 2002. Nonetheless, we must vacate the verdict and remand, as the trial court erred by including claimed reletting expenses in the award and by awarding interest on Landlord's attorneys' fees, costs and expenses prior to the court's verdict. Our reasoning follows.

We previously summarized the facts and procedural history of this case when deciding a prior appeal:

This appeal arises from [Tenant's] termination of a lease agreement to take possession of and operate a proposed grocery store, which was to be built in a shopping center, to be known as the 'Town Square Plaza,' which [Landlord] was developing in Chester County, Pennsylvania. [Landlord], in 1996, had identified the potential site for commercial development and executed several agreements of sale to acquire the land. At that time, the land was not zoned for commercial uses, and [Landlord] conditioned its obligations to close upon the sales agreements on its ability to obtain approval to construct the shopping center.

Negotiations between [Landlord] and Genuardi's, Safeway's predecessor in interest, began in 1998, and the parties drafted a written lease agreement to govern the construction and occupancy of a grocery store in the as-yet-unbuilt shopping center. Section 6.4 of the lease agreement provided, in relevant part:

**Completion Date.** If building permits for the Tenant Building shall not have been issued by January 1, 2001, if the footings and foundations of the Tenant's Building shall not have been completed and the structural steel erected on or before May 1, 2001, or if the Delivery Date shall not have occurred on or before September 1, 2001, ... Tenant shall have the right, at its option, in any such event, to (i) extend from time to time a Completion Date; or, (ii) upon notice to Landlord and Landlord's failure to comply within an addition[al] thirty (30) day period to terminate this Lease whereupon this Lease and the term hereof shall immediately cease and expire....

Lease Agreement, § 6.4.

Continued negotiations between [Landlord] and Genuardi's revealed the parties' shared concerns that [Landlord] would not be able to meet the deadlines set forth in section 6.4 of the draft lease, and that [Landlord] had yet to enter

---

1. Present value is defined as "[t]he sum of money that, with compound interest, would amount to a specified sum at a specified future date; future value discounted to its value today." BLACK'S LAW DICTIONARY 1222 (8th ed. 2004). "The rationale for reducing a lump-sum award to its present value is that it is assumed that the plaintiff will invest the sum awarded and receive interest thereon. [...] The projected interest must therefore be allowed in reduction of capital lest it be claimed that the plaintiff is overcompensated." *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027, 1030 (1980) (formatting and citation omitted).

into a lease with a retail store as a co-anchor. Genuardi's['] counsel, in a letter dated March 31, 2000, proposed a plan to execute a long-term lease and place the lease into 'escrow.' That proposal read in relevant part:

> In accordance with our mutual understanding, the five (5) fully executed copies [of the lease] will be held in escrow by [Genuardi's] pending [Landlord] entering into a fully binding lease agreement or agreement of sale with either Target or Lowe's Home Center to build and operate a store as the anchor tenant located in the shopping center. At such time as the aforementioned lease or agreement of sale is verified, the lease agreements will be released and [Genuardi's] will mail two (2) fully executed copies to your attention. In the event that the aforesaid lease agreement or agreement of sale are not entered into within the six months period beginning April 1, 2000, [Genuardi's] reserves the right to terminate the lease agreements upon written notice to [Landlord] and all the fully executed lease agreements being destroyed.
>
> *I also wish to clarify that [Landlord's] right to delay commencement of [Landlord's] Work until the cotenancy requirements have been met by [Landlord], do [sic] not in any way negate [Landlord's] obligation to perform as required under section 6.4 of the Lease in regard to [Landlord's] completion dates and [Genuardi's] rights under the lease.*

Letter from Robert C. Fernandez to Howard M. Rittberg, March 31, 2000 (emphasis supplied).

Representatives of [Landlord] and Genuardi's thereafter signed the lease agreement on April 4, and April 14, 2000, respectively. Counsel for [Land-lord], in a letter dated April 25, 2000, addressed to Genuardi's, memorialized the terms of the escrow arrangement when he wrote:

> Five copies of the Lease have been executed by [Landlord] and are delivered to you for execution by [Genuardi's] to be held in Escrow pursuant to the terms of your letter of March 31, 2000 as amended by this letter....
>
> \* \* \*
>
> The Lease will be held in Escrow pursuant to the terms of your letter with the additional condition that either party, i.e. [Landlord] or [Genuardi's] may terminate the Lease, if the condition set forth in your letter regarding the Sale or Lease to Target or Lowe's Home Centers is not satisfied within one (1) year from the date of the closing of the Sale of the Shopping Center property to Landlord. *In the event of a delay in the closing which affects the construction schedule, the parties agree to discuss amending the completion dates set forth in the Lease to reflect a reasonable schedule.*

Letter from Howard M. Rittberg to Robert C. Fernandez, April 25, 2000 (emphasis supplied).

Counsel for Genuardi's then responded with the letter dated May 2, 2000, which read as follows:

> Response is made to your letter of April 25, 2000 regarding the above captioned lease agreement between our respective clients. Enclosed are copies of the signature pages to the lease agreement indicating that they have been executed on behalf of [Genuardi's] and will be held in escrow *in accordance with my letter of March 31, 2000 and your amending letter of April 25, 2000. I am holding five (5) fully executed copies of the lease*

*agreement in escrow pursuant thereto.*

Letter from Robert C. Fernandez to Howard M. Rittberg, May 2, 2000 (emphasis supplied).

Representatives of Genuardi's, in December of 2000, informed [Landlord] of its pending acquisition by Safeway. That acquisition was completed in February of 2001, and all parties agreed to an assignment of the lease agreement to Safeway. At that time, representatives for Safeway and [Landlord] also met to discuss the Town Square Plaza project. As a result of this meeting, [Landlord] mailed a proposed timeline to Safeway indicating, *inter alia,* that it was not expecting final approval of the development plan until March of 2002. Nonetheless, throughout 2001, the parties continued to communicate regarding Safeway's presence in the shopping center, as well as the structural details of the planned grocery store. Moreover, Safeway, in a letter dated October 16, 2001, proposed the construction of a larger store while maintaining the same total rent as provided for under the lease agreement, a request that was motivated by the fact that a competitor had recently opened in a nearby shopping center. [Landlord] replied that it could redesign the footprint of the grocery store, but would impose an additional charge for the additional space sought by Safeway at the per-square-foot rental rate set forth in the lease agreement. Nearly four months later, Safeway, by letter dated February 13, 2002, informed [Landlord] that it was terminating the lease agreement due to [Landlord's] failure to meet the deadlines set forth in section 6.4 of the lease agreement. [Landlord] responded by letter dated February 14, 2002, in which it reminded Safeway of the arrangement to hold the lease in escrow, and stated that it would

not accept termination. Safeway, however, maintained that it had a right to terminate under the lease agreement. Consequently, on March 20, 2002, [Landlord] filed a complaint against [Tenant] alleging, *inter alia,* an anticipatory breach of the lease agreement.

After commencing its action against [Tenant], [Landlord] sought replacement tenants, and eventually obtained commitments from PetSmart and [Michaels] (hereinafter the 'substitute tenants') to occupy the area previously reserved for Safeway. [Landlord] thereafter obtained zoning approval and permits for the construction of the shopping center. In March of 2004, [Landlord] closed upon the agreements for the sales of the land underlying the shopping center, and consummated a lease with Lowe's Home Center. Three months later, in June of 2005, [Landlord] entered into an agreement of sale with Inland Real Estate Acquisitions ([']Inland[']) for the sale of the shopping center.

On October 3, 2005, [Landlord's] action against [Tenant] proceeded to a nonjury trial, which encompassed ten days of testimony taken from October of 2005, to January of 2006. During trial, [Landlord] began receiving rent payments from its substitute tenants for December of 2005, and, on December 28, 2005, [Landlord] closed on its agreement to sell the shopping center to Inland. The trial judge, on September 6, 2006, rendered a verdict in which he found that [Tenant] had breached the lease agreement and entered an award in favor of [Landlord] in the amount of $131,277.00. Both parties filed post[-]trial motions, and the trial court, on December 19, 2006, granted [Landlord's] motion in part, increased the amount awarded to [Landlord] to $316,889.92, and denied all other motions. Thereafter, [Landlord]

filed a notice of appeal, and [Tenant] filed its notice of cross appeal.

*Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.,* 162 EDA 2007, 2–7, 954 A.2d 48 (Pa.Super. April 25, 2008) (unpublished memorandum) (footnotes omitted).

The parties raised numerous issues on appeal, which this Court reduced to two concerns: "(1) whether the trial court erred in determining that [Tenant] had breached an enforceable promise, and (2) whether the trial court properly determined the amount of damages arising from the breach." *Id.* at 7–8. We affirmed the trial court's finding that Tenant breached an enforceable promise, but reversed as to its calculation of damages, holding instead that the correct measure of damages was contained in section 20.2.2 of the lease agreement ("Section 20.2.2 Damages"),[2] which included, *inter alia,* damages of all rent for the 20–year lease term. We found that the trial court erred by concluding that section 20.2.2 of the lease was an unenforceable liquidated damages clause. Tenant filed a petition for reargument before this Court on May 9, 2008, which we denied on July 2, 2008. Tenant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

On remand, following the submission of briefs by both parties, the trial court entered an order awarding Landlord

$18,489,221.60 in damages—$10,494,490.00 in expectation damages, $30,808.00 for reletting expenses, $6,279,734.00 in interest, and $1,684,189.34 for attorney's fees, costs and expenses with interest—with post-judgment interest to accrue at the rate of prime plus two percent. The trial court denied Tenant's request to reduce the damages award to present value.

Tenant filed a timely notice of appeal, and both it and the trial court complied with Pa.R.A.P. 1925. In response, Landlord filed a motion to quash the appeal, arguing that Tenant had waived all issues for review by failing to file a post-trial motion following the remand order pursuant to Pennsylvania Rule of Civil Procedure 227.1. This Court agreed and quashed the appeal on March 18, 2011. The Pennsylvania Supreme Court vacated our Order and remanded the matter for our consideration of the merits of the issues raised on appeal on November 1, 2012.

On July 29, 2013, a majority of a three-judge panel of this Court, with one dissent, found that the trial court erred by failing to reduce the damages award to present value, by failing to account for Landlord's duty to mitigate for the second half of the 20–year lease, and by including damages for reletting expenses, but affirmed the trial court's order in all other respects. Landlord filed a petition for reargument

**2.** Section 20.2.2 of the lease agreement, which appears under the heading "DEFAULT & REMEDIES," states:

*Reletting:* Without terminating this Lease, Landlord may re-enter and repossess the Leased Premises, or any part thereof, and lease them to any other Person upon such terms as are reasonable, for a term within or beyond the Term [set forth in the lease agreement]. Any such reletting shall be for the account of Tenant, and *Tenant shall remain liable for the excess (if any) of (a) all Rent which would be payable under this Lease by Tenant in the absence of such*

*repossession;* over (b) the proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds any Reletting Expenses [ ... ] No repossession of the Leased Premises or any part thereof pursuant to this section 20.2.2. shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such repossession, and *Landlord may, at its option, sue for and collect all Rent and other charges due hereunder at any time when such charges accrue.*
Lease Agreement, § 20.2.2 (emphasis added).

before this Court on August 13, 2013, which we granted on October 2, 2013.

The matter is now before this Court *en banc* for resolution. Tenant raises the following issues for our review:

1. Must [Landlord's] award for lost rent be reduced to present value where [Landlord] consistently conceded that its future lost rent payments should be reduced to present value?

2. Must [Landlord's] award for future lost rent be reduced to present value where Pennsylvania law requires such reduction in order to avoid conferring a windfall on [Landlord], especially in a twenty-year lease that itself accounts for inflation by escalating the base rent over that twenty-year term?

3. Must [Landlord's] award for future lost rent be reduced to present value when such reduction is the only result that is consistent with this Court's decision in a prior appeal in this case?

4. Must this Court's decision in a prior appeal in this case that the [l]ease's non-acceleration clause does not apply to rent be overturned where the clause prohibits accelerating 'any monetary obligation'?

Tenant's Supplemental Brief at 1.

■ Must [Landlord's] lost future rent damages be reduced to reflect mitigation for the second half of [Tenant's] twenty-year lease term where: (1) the trial court previously had found [Landlord's] damages submission 'highly unreliable' precisely because it assumed no mitigation for the second half of the lease; and (b) [Landlord] did not challenge that finding in either its post-trial moving papers or in the first appeal?

■ Must the trial court's award of prejudgment interest to [Landlord] be reduced where: (a) in cases of anticipatory breach, prejudgment interest does not begin to run until the date on which performance would have been due; and (b) performance was not due until June 2005, more than three years after the date from which the trial court awarded prejudgment interest?

■ Must the trial court's award of $536,629 in reletting expenses to [Landlord] be eliminated where: (a) the trial court previously found that [Landlord's] testimony regarding that $536,629 in reletting expenses was not credible; and (b) this Court affirmed that finding in the first appeal?

■ Must the trial court's award of prejudgment interest to [Landlord] on the entirety of its attorneys' fees and costs be eliminated where [Tenant] had no contractual obligation to pay [Landlord's] attorneys' fees and costs prior to the trial court's entry of final judgment?

Tenant's Original Brief at 2–3.[3]

When reviewing the verdict from a bench trial, we must review the evidence of record in the light most favorable to the verdict winner to determine whether competent evidence supports the trial court's findings and whether it erred in reaching its conclusions of law. *McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa.Super.2013). We afford the same weight to the trial court's findings of fact as we do a jury's verdict. *Id.* We will only reverse if the trial court's findings of fact are unsupported by competent evidence or if it erred as a matter of law. *Id.*

---

**3.** On reargument, Tenant elected to file both its originally filed appellate brief and a supplemental brief. Tenant substituted the first argument originally raised on appeal with the four issues raised in its supplemental brief.

Tenant's Supplemental Brief at 5 n. 2. In all other respects, Tenant relies on the arguments contained in its original brief to address the remaining issues. *Id.*

## A. Reduction of Damages to Present Value

■ The first three issues raised by Tenant on appeal concern the trial court's refusal to reduce Landlord's damages award for rent due under the lease to present value. The trial court did not find any of the arguments or authority presented by Tenant to warrant reducing the damages to present value. Trial Court Opinion, 1/15/10, at 2. The trial court further found that the 2008 Superior Court decision "was clear that the damage formula agreed to by the parties in § 20.2.2 of the lease provided an agreed upon damage calculation for actual damages for the lost expected rents," and "[t]he agreed upon damage calculation language clearly does not require reduction to present value." *Id.* Tenant asserts that the trial court erred because 1) Landlord "conceded" that damages must be reduced to present value and is judicially estopped from seeking non-reduced damages; 2) damages must be reduced to present value as a matter of law; and 3) the 2008 Superior Court decision supports reducing the damages to present value. Tenant's Supplemental Brief at 19–33. In its fourth issue, Tenant contends that the 2008 panel of this Court incorrectly determined that the non-acceleration clause contained in section 24.5 of the lease agreement did not apply to rent due, which would moot any question of whether damages must be reduced to present value. *Id.* at 34–37. These issues raise questions of contract interpretation [4] and the calculation of damages, both of which are questions of law triggering a *de novo* standard of review and a plenary scope of review. *Helpin v. Trustees of Univ. of Pennsylvania*, 608 Pa. 45, 10 A.3d 267, 270 (2010) (correct calculation of damages is a question of law); *Mut. Ben. Ins. Co. v. Politopoulos*, 75 A.3d 528, 535 n. 5 (Pa.Super.2013) (contractual interpretation is a question of law).

■ We begin by addressing the fourth argument posited by Tenant because, as Tenant recognizes, if the non-acceleration clause contained in section 24.5 of the lease agreement applies to damages for rent, it moots the question of whether damages should be reduced to present value—no additional rent would be due after Landlord's sale of the development to Inland. Tenant's Supplemental Brief at 37. Landlord asserts that this issue is not properly before us, as Tenant failed to appeal the 2008 decision to the Pennsylvania Supreme Court, rendering the 2008 decision on the matter final. Landlord's Supplemental Brief at 31.

Tenant acknowledges that following this Court's 2008 decision, it sought reargument *en banc*, which this Court denied on July 2, 2008, and did not seek review before our Supreme Court at that time.[5] We therefore agree with Landlord that the issue was finally determined in 2008. Rule of Appellate Procedure 1112(b) defines a final order of the Superior Court as "any order that concludes an appeal, including an order that remands an appeal, in whole or in part, unless the appellate court remands and retains jurisdiction." Pa.

---

**4.** Although the breached written agreement before us is a lease, contract law and general contract principles govern lease agreements. *Giant Food Stores, LLC v. THF Silver Spring Dev., L.P.*, 959 A.2d 438, 447 (Pa.Super.2008).

**5.** Tenant attempted to have this issue reviewed by our Supreme Court when Tenant filed its petition for allowance of appeal from this Court's 2011 decision quashing its appeal, but the Supreme Court declined to review that issue. *See Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Markets, Inc.*, 612 Pa. 320, 30 A.3d 1104 (2011) (limiting the grant of review to the question of whether the Superior Court erred by quashing Tenant's appeal).

R.A.P. 1112(b). A petition for allowance of appeal to the Pennsylvania Supreme Court must be filed within 30 days of the entry of the Superior Court order to be reviewed. Pa.R.A.P. 1113(a). Tenant failed to timely raise this argument before the Supreme Court following our 2008 decision, and the issue is not properly before this Court *en banc* for review in this subsequent appeal. *See Spang & Co. v. USX Corp.,* 410 Pa.Super. 254, 599 A.2d 978, 981 (1991) (finding that because an appellant failed to request relief in a prior appeal, "the opportunity was lost"), *appeal denied,* 531 Pa. 640, 611 A.2d 712 (1992). Furthermore, this issue was not included in Tenant's concise statement of errors complained of on appeal, and therefore is likewise waived on that basis. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Even if not waived, the issue is meritless. The relevant portion of section 20.2.2 of the lease agreement states that in the event of Tenant's breach, "Landlord may, at its option, sue for and collect **all Rent** and other charges due hereunder at any time when such charges accrue." Lease Agreement, § 20.2.2 (emphasis added). Section 24.5 of the lease agreement states, in relevant part: "Landlord shall not be entitled to, and shall not, accelerate any monetary obligation of Tenant." *Id.* at § 24.5. The 2008 panel of this Court found, "reading section 20.2.2 and 24.5 together, it is apparent that the non-acceleration clause only applied to 'other charges ... when such charges accrue' and not 'all rent.'" *Newman Dev. Grp. of Pottstown, LLC,* 162 EDA 2007 at 16–17 n. 7.

██ We agree with the interpretation provided by the 2008 panel of this Court. "A court may not disregard a provision in a contract if a reasonable meaning may be ascertained therefrom ... each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument." *Seven Springs Farm, Inc. v. Croker,* 748 A.2d 740, 746 (Pa.Super.2000) (*en banc*) (citation omitted), *aff'd,* 569 Pa. 202, 801 A.2d 1212 (2002). The above-quoted portion of section 20.2.2 of the lease states that if Tenant breaches the lease agreement, Landlord may immediately sue for all rent due under the lease, as well as other charges due at the time those other charges accrue. In order to give effect to every part of the contract, the non-acceleration clause cannot apply to Landlord's right to sue for all rent in the event of a breach by Tenant. Thus, when considering section 20.2.2 together with section 24.5 of the lease, it is clear that the non-acceleration clause applies only to "other charges," and not to "all rent" that is recoverable in the event of a breach by Tenant.

Turning now to the first argument raised in support of reducing damages for rent to present value, we note that the record belies Tenant's contention that Landlord "*never* requested prior to the 2008 remand that the trial court award damages that were *not* reduced to present value." Tenant's Supplemental Brief at 19 (emphasis in the original). To the contrary, the record reflects that Landlord requested the full amount of unreduced damages due under the contract in both its complaint and its amended complaint, as well as in its answers to interrogatories. Complaint, 3/20/02, at ¶¶ 57–59, Prayer for Relief; Amended Complaint, 7/1/02, at ¶¶ 70–72, Prayer for Relief; N.T., 1/17/06, at 56–57.

The record further reflects that Landlord provided testimony in opposition to reducing Section 20.2.2 Damages to present value at trial. Marc Newman ("New-

man"), one of the owners of Newman Development Group, testified that Landlord was entitled to damages of lost rent pursuant to section 20.2.2 of the lease agreement, which measured the loss in value to the whole lease.[6] N.T., 1/17/06, at 85–91; Landlord's Exhibit P–430. Those damages, according to his calculations, were $10,494,490.00. N.T., 1/17/06, at 91. On cross-examination, counsel for Tenant asked Newman the following question: "Mr. Newman, first we agree, don't we, that pursuant to the lease and the various calculations you have to go to—your gross number of 11 million needs to be reduced to present value, doesn't it?" *Id.* Newman responded by referring counsel to the agreement between the parties, stating the damages would only need to be reduced to present value if that requirement was included in the lease agreement. *Id.* at 91–92. The lease agreement includes no such provision. *See* Lease Agreement, § 20.2.2.

Moreover, Tenant's own expert witness recognized Newman's non-reduced damage calculation. He testified and provided a report reducing Section 20.2.2 Damages testified to by Newman to present value to rebut Newman's calculation of damages. *See* Tenant's Exhibit D–100 (entitled "Response to Newman Alternate Damages Claim"); N.T., 1/19/06, at 77.

The only evidence presented by Landlord at trial regarding the reduction of Section 20.2.2 Damages to present value came after it rested its case. The record reflects Tenant's expert, Michael Axler ("Axler"), testified and calculated Section 20.2.2 Damages reduced to present value. *See,* N.T., 1/19/06, at 62–77; Tenant's Exhibit D–100. Landlord's expert, Richard Marchitelli ("Marchitelli"), testified in rebuttal to Axler's present worth calculation, and provided a different calculation of Section 20.2.2 Damages reduced to present value. N.T., 1/20/06, at 68–72; Landlord's Exhibit P–430. Marchitelli clarified that his present value testimony was based solely upon Axler's testimony, and did not reflect his opinion regarding the appropriate measure of damages.[7] N.T., 1/20/06, at 72–73, 75–76, 90–91.

■ Landlord did present Section 20.2.2 Damages reduced to present value in its proposed conclusions of law and post-trial motion before the trial court. *See* Plaintiff's Proposed Conclusions of Law, 4/5/06, at 40–42; Plaintiff's Post Trial Motion, 9/18/06, at 8. This does not constitute an admission or "concession" as Tenant claims. There are only two types of admissions: judicial admissions[8] and evidentiary admissions.[9] Both are limited in scope to factual matters otherwise requiring evidentiary proof. A party cannot "admit" a legal theory or question of law. *In re: Paxson Trust I,* 893 A.2d 99, 113 n. 10 (Pa.Super.2006); *Gibbs v. Herman,* 714 A.2d 432, 437 (Pa.Super.1998); *see also*

---

6. *See supra,* n. 2.

7. In Marchitelli's opinion expressed prior to remand, the correct measure of damages was based upon the diminution in the value to property because of Tenant's breach, as reflected by the sale of the shopping center by Landlord to Inland. N.T., 11/10/05, at 65–67, 81–82.

8. A judicial admission is "a clear and unequivocal admission of fact." *DeArmitt v. New York Life Ins. Co.,* 73 A.3d 578, 590 (Pa.Super.2013) (citation omitted). It is "an

express waiver made in court or preparatory to trial by a party to gain an advantage, conceding for the purposes of trial the truth of the admission." *Id.* (citation omitted).

9. An evidentiary admission is a statement made by a party relating to certain facts. *Gibbs v. Herman,* 714 A.2d 432, 437 (Pa.Super.1998). "Judicial admissions are conclusive, whereas evidentiary admissions may always be contradicted or explained." *Id.* (citation omitted).

*Helpin*, 10 A.3d at 270 (the question of how to calculate damages is a question of law). Thus, it is incapable of being an admission.

■■■■ We also disagree that the doctrine of judicial estoppel prohibits Landlord from seeking non-reduced Section 20.2.2 Damages. Pursuant to the doctrine of judicial estoppel, "a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." *In re Adoption of S.A.J.*, 575 Pa. 624, 838 A.2d 616, 620 (2003).[10] Here, Landlord presented Section 20.2.2 Damages in both reduced and non-reduced amounts to the trial court. According to Landlord, it presented Marchitelli's testimony regarding the present value of Section 20.2.2 Damages as an alternative in the event the trial court found that the damages must be so reduced. Landlord's Supplemental Brief at 19. The record supports this assertion. Our review of the record reveals that Landlord presented before the trial court three different methods by which to calculate damages: (1) Marchitelli's diminution of value theory (N.T., 11/10/05, at 65–67, 81–82; *see supra*, n. 5); (2) Section 20.2.2 Damages not reduced to present value (N.T., 1/17/06, at 85–91); and (3) Section 20.2.2 Damages reduced to present value, in rebuttal (N.T., 1/20/06, at 68–72). On remand, Landlord requested that the trial court not reduce Section 20.2.2 Damages to present value, which is consistent with the position previously taken by Landlord before the trial court. On appeal, Landlord continues to assert that Section 20.2.2 Damages should not be reduced to present value. There is no inconsistency between the position advanced by Landlord before the trial court and the position now taken by Landlord on appeal. As such, the doctrine of judicial estoppel is inapplicable to the case before us.

■■■ Tenant next asserts that damages must be reduced to present value as a matter of law. Our research reveals, however, that it is not, as Tenant claims, "hornbook law" that future damages must be reduced to present value in Pennsylvania. Tenant's Supplemental Brief at 24–25. In support of this proposition, Tenant cites to two national treatises, neither of which point to any Pennsylvania or other precedential law. *See id.* (citing C.J.S. *Damages* § 38 (2010); WILLISTON ON CONTRACTS § 66:86 (4th ed. 2002)). To buttress its assertion that reduction to present value "has long been the rule of Pennsylvania," Tenant cites to five tort cases involving personal injury dating from 1896 until 1963, all of which called for the reduction of damages for lost future earnings to present value.[11] *See* Tenant's Supplemental Brief at 25–26.

---

10. In a footnote in *In re Adoption of S.A.J.*, our Supreme Court observed that it has not finally determined whether successful maintenance of the prior inconsistent position is a prerequisite to the applicability of the doctrine of judicial estoppel or simply a factor that weighs in favor of its application. *In re Adoption of S.A.J.*, 838 A.2d at 620 n. 3. Because it found that the appellant successfully maintained the position in the prior proceeding, the Court declined to resolve the question in that case. Based upon our resolution of the issue in the case at bar, we likewise do not reach this question.

11. Tenant also cites an unpublished 2006 decision from United States District Court for the Eastern District of Pennsylvania, which has no precedential value in this matter. *See* Tenant's Supplemental Brief at 26 (citing *HC Consulting, Inc. v. Goodman*, 2006 U.S. Dist. LEXIS 79821, 2006 WL 3165035 (E.D.Pa. Oct. 31, 2006); *see also In re Stevenson*, 615 Pa. 50, 40 A.3d 1212, 1221 (2012)) ("pronouncements of the lower federal courts have only persuasive, not binding, effect on the courts of this Commonwealth").

Insofar as personal injury cases were concerned, in 1980, our Supreme Court instructed Pennsylvania Courts, *inter alia*, "to abandon the practice of discounting lost future earnings." *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027, 1039 (1980).[12] Thus, the cases cited by Tenant no longer have precedential value on even the limited question of whether an award for damages of lost future earnings must be reduced to present value.[13]

More importantly, as to the precise issue presented in this case, Tenant does not cite to any Pennsylvania case law requiring the reduction of future damages to present value in a breach of contract action where the remedy for breach and the calculation of damages is set forth in the contract. The only Pennsylvania appellate court case addressing the issue of reducing future damages to present value in a contract action holds that in order to reduce damages to present value, it must be a negotiated term contained in the contract. *See Trust Co. of Glen Rock v. Shrewsbury Furniture & Mfg. Co.*, 104 Pa.Super. 564, 158 A. 641, 643 (1932) (holding that because the parties agreed to the amount of damages to be paid in the event of a breach and did not include a provision in the contract calling for the present value of that sum to be paid, damages following repudiation of the contract should not be reduced to present value).[14]

In the case before us, two sophisticated parties negotiated the terms of a lease covering the contingencies of performance over a 20–year term and the consequences of breaches of the agreed upon terms. The damage calculation for a breach by Tenant is articulated in section 20.2.2 of the lease, which includes sums for future rents, and section 20.4 provides for the rate of interest the Tenant is obligated to pay to Landlord on sums owed as a result of Tenant's breach.[15] The lease does not require that those sums be reduced to present value.

It is beyond dispute that the inclusion or exclusion of a requirement to reduce future damages to present worth is a significant monetary consideration. As recognized in *Kaczkowski*, deciding on the appropriate rate to be used to reduce the damages to present value ("discount rate") requires the consideration and accumulation of complex economic data and information. *See Kaczkowski*, 421 A.2d at 1038. All such data and information was readily available to the parties to the lease

---

**12.** *Kaczkowski* was a wrongful death and survival action brought on behalf of the estate of a deceased victim of a motor vehicle accident. The Supreme Court adopted the "total offset" method for projecting an award of future damages. *Kaczkowski*, 421 A.2d at 1036. The total offset method assumes that over time, inflation and interest rates equal one another. *Id.* at 1037–38. Thus, projection of an award of future earnings should not be increased by an inflationary value nor should it be reduced to present worth based upon a rate of interest otherwise used to compensate for earnings on a lump sum award. *Id.*

**13.** Tenant correctly states that in *Helpin v. Trustees of Univ. of Pennsylvania*, our Supreme Court stated that it "decided *Kaczkowski* narrowly," and that "in other contexts" the Court "did not wish to disturb the requirement that an award be discounted to present value, assuming an interest rate of six percent." *Helpin*, 10 A.3d at 274 (citing *Kaczkowski*, 421 A.2d at 1036 n. 21). While so noting, the Supreme Court in *Helpin* decided that in the breach of employment contract case before it involving a claim for lost future earnings, including potential merit based bonuses, the rule of *Kaczkowski* would apply. *Id.* at 277.

**14.** Section 2A–529 of the Uniform Commercial Code, which controls leases of goods, requires the reduction of damages to present value when the lessee defaults. U.C.C. § 2A–529(1).

**15.** *See infra*, Part C. Interest on Damages.

during the negotiation process. To the extent it was intended to be a consideration in the calculation of damages for breach, a discount rate would have been so stated in the lease.

To highlight our conclusion, we observe that the lease between the substitute tenant, PetSmart, and Landlord includes a clause requiring that in the event of PetSmart's breach, damages pursuant to the lease are required to be reduced to present value at a rate of eight percent. *See* Landlord's Exhibit P–335 (PetSmart Lease, § 19.2). To explain away the obvious inclusion of the negotiated requirement of the reduction of damages to present value, Tenant, without citation to authority, claims that although parties typically do not need to provide for the reduction of damages to present value because "present value reduction operates as a matter of law, [ ... ] *where parties contracting under Pennsylvania law want to modify the default discount rate of 6%, a specific clause is required.*" Tenant's Supplemental Reply Brief at 17 n.10 (emphasis added). This rationale is indeed curious because by Tenant's own argument, Tenant was therefore required to include a term in the lease calling for the reduction of damages to present value because Tenant's expert used a discount rate of *nine percent* when reducing damages to present value. N.T. 1/19/06, at 69; Tenant's Exhibit D–100.

As stated above, contract law and general contract principles govern lease agreements. *Giant Food Stores, LLC v. THF Silver Spring Dev., L.P.,* 959 A.2d 438, 447 (Pa.Super.2008). "As such, when the language of a lease is clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties." *Id.* (citation omitted). There is nothing in the lease agreement at issue that suggests the sophisticated parties to this negotiated commercial lease intended for the reduction to present value of future damages calculated pursuant to section 20.2.2 of the lease nor does Pennsylvania law mandate such a reduction. We therefore find that the trial court's decision not to reduce Landlord's damages award to present value for Tenant's anticipatory breach of the lease agreement is supported by the record and the law.[16]

■■■ We likewise disagree with Tenant's third claim of error—that reducing

---

**16.** For the first time, Tenant also raises an argument that the damages must be reduced to present value because the lease agreement "escalates rent by nearly twelve percent in years ten through twenty, thus already accounting for inflation by providing specific increases in base rent over the lease term," resulting in Landlord's overcompensation if damages are not reduced to present value. Tenant's Supplemental Brief at 29 (internal citation to the lease omitted). A new argument cannot be raised in support of an issue on appeal if it was not first presented before the trial court. *Schultz v. MMI Products, Inc.,* 30 A.3d 1224, 1230 (Pa.Super.2011); Pa. R.A.P. 302(a). Thus, this argument is waived.

Even if not waived, this claim is an unsupported factual assertion. There is nothing in the lease or the record to suggest that the incremental increases in rent are intended to account for inflation. Our review of section 1.8 of the lease agreement addressing "Base Rent" suggests to the contrary, as there is no increase in rent for the first 10 years of the lease, a $2.00 increase beginning in year 11, and then no additional increase for the next 10 years. *See* Lease Agreement, § 1.8. This would assume no inflation for two 10–year periods. In its supplemental reply brief, Tenant acknowledges that to account for inflation, the lease should "increase[ ] the rent by a fixed amount *each year,*" but erroneously states that the lease at issue does so. Tenant's Supplemental Reply Brief at 19 (emphasis added). Regardless, the reason for the increases in rent is *dehors* the record and we cannot accept that this is an inflation factor as opposed to, for example, a negotiated rent for the first 10 years that was below market value as an incentive to this anchor tenant.

Section 20.2.2 Damages to present value is necessary to be consistent with this Court's 2008 panel decision. *See* Tenant's Supplemental Brief at 31–33. As the 2008 panel recognized, when a breach of contract occurs, the law protects a party's expectation interest "by attempting to put [that party] in as good a position as he would have been had the contract been performed, that is, had there been no breach." *Newman Dev. Grp. of Pottstown, LLC*, 162 EDA 2007 at 15 (quoting *Ferrer v. Trustees of Univ. of Pennsylvania*, 573 Pa. 310, 825 A.2d 591, 609 (2002)). The panel found that section 20.2.2 of the lease agreement measured "[Landlord's] expectation interest in the contract as the total rent owed over the term of the entire lease[.]" *Id.* at 17. We made no mention of reducing Section 20.2.2 Damages to present value. Rather, the Court called for the imposition of damages pursuant to the express language of the lease agreement, which, as discussed hereinabove, does not call for a reduction of damages to present value. *Id.* at 17–18; *see* Lease Agreement, § 20.2.2. Indeed, the trial court precisely followed the remand instructions from this Court.

We reiterate that we are interpreting a negotiated commercial contract between sophisticated business people who had the ability to control, decide and design remedies for breach. In fact, they did. As noted, the parties dealt with how to address a breach, making Tenant liable for "all Rent." The parties could have negotiated a term requiring the damages to be reduced to present value upon a total anticipatory breach by Tenant, but for whatever reason did not do so.[17] There is exacti-

tude to the obligations undertaken and the damages for a breach of those obligations. Based on the foregoing, we find no error in the trial court's decision not to reduce Landlord's verdict for future damages awarded to present value.

## B. Mitigation

 As its fifth issue on appeal, Tenant asserts that the trial court erred by failing to account in the damages award for Landlord's duty to mitigate for the second half of the 20–year lease. Tenant's Original Brief at 33–38. Tenant states that this was error because of the trial court's finding in its 2006 opinion that Newman's failure to account for Landlord's duty to mitigate for the second half of the 20–year lease rendered his final calculation of damages "highly unreliable." *Id.* at 33. Tenant further argues that Landlord "conceded," in both its post-trial motion and appellate brief in the first appeal, that damages must include mitigation for the second 10 years. *Id.* at 33–34.

 We review this issue according to the following standard:

The duty of assessing damages is within the province of the [fact-finder] and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. If the verdict bears a reasonable resemblance to the dam-

17. The parties negotiated other terms, such as the "Default Rate" to be paid by Tenant on sums owed as a result of default. *See* Lease Agreement, § 1.15 (defining "Default Rate" as the "lesser of: (a) the Prime Rate (as hereinafter defined) plus two percent (2%) per annum; or (b) the highest interest rate permitted by Applicable Law."), § 20.4 (awarding interest at the Default Rate on all expenses incurred following Tenant's default and Landlord's commencement of a lawsuit for repossession).

ages proven, we will not upset it merely because we might have awarded different damages.

*Hatwood v. Hosp. of the Univ. of Pennsylvania,* 55 A.3d 1229, 1240–41 (Pa.Super.2012) (citation omitted), *appeal denied,* 619 Pa. 723, 65 A.3d 414 (2013). "The factfinder must assess the worth of the testimony, by weighing the evidence and determining its credibility and by accepting or rejecting the estimates of the damages given by the witnesses." *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983) (internal citation omitted).

Section 20.3 of the lease agreement, which addresses "Mitigation of Damages," states: "Upon the occurrence of a Tenant Default, Landlord agrees to endeavor in good faith to mitigate any damages for which Tenant may be liable." Lease Agreement, § 20.3. At trial, Newman testified that after Tenant anticipatorily breached the lease agreement, Landlord contacted numerous other possible tenants, including other grocery stores, large retail stores, and ultimately smaller retail stores. N.T., 10/3/05, at 188–97. According to Newman, despite the efforts made, Landlord was unable to find a store willing to lease the same size location for the same price or duration as Tenant's lease. N.T., 1/17/06, at 80–83. He therefore calculated Section 20.2.2 Damages, in relevant part, by taking the rent Landlord would have received from Tenant over the 20–year lease term ($15,104,960.00) and subtracted from it the proceeds it received from PetSmart ($2,619,500.00) and Michaels ($1,990,970.00) for their respective 10–year leases, resulting in a total amount of mitigated damages of $10,494,490.00. N.T., 1/17/06, at 85–86. Newman did not account for any rent Landlord might receive in the second 10 years of Tenant's lease because

he did not know what rent, if any, would be paid during that time, and he did not believe the lease required him to mitigate for the entirety of Tenant's lease period. *See id.* at 94–102.

Tenant's expert Axler testified, in relevant part, to a formula to calculate amounts for mitigation of the second 10 years after PetSmart's and Michaels' original leases expire, using a 50 percent probability that the replacement tenants would renew their leases. N.T., 1/19/06, at 68–69. In rebuttal, Landlord recalled its expert Marchitelli, who testified that Axler failed to include various costs associated with finding replacement tenants at the expiration of PetSmart's and Michaels' leases, including tenant improvement costs, leasing commissions, months of free rent, and time of vacancy. N.T., 1/20/06, at 68–69. Using Axler's 50 percent probability of renewal model, Marchitelli testified to what he believed the correct mitigation numbers would be for the second 10 years of Tenant's lease. *Id.* at 69–72.

In its 2006 opinion, the trial court found that Newman's theory as to the correct measure of damages (*i.e.,* that Landlord was entitled to rent not received by Tenant, less those amounts received by the substitute tenants) was "reliable." Trial Court Opinion, 8/15/06, at 13. It found Newman's testimony as to the amount of damages due (*i.e.,* damages for the full 20–year lease term pursuant to section 20.2.2 of the lease, less 10 years of rent from the substitute tenants) was "highly unreliable" because of the failure to "account for future tenants or any other factors that may have affected the amount of rent [Landlord] would have received," and Newman's acknowledgement "that there was no way to know what would happen after the first ten years of Pet[S]mart's and Michael[']s[ ]

leases[.]" *Id.*[18]

On appeal, the 2008 panel found that the trial court erred by reaching this conclusion. The 2008 panel stated that damages should be awarded to Landlord pursuant to section 20.2.2 of the lease agreement. It found that Section 20.2.2 Damages are calculated by taking "(1) [Landlord's] expectation interest in the contract as the total rent owed over the term of the entire lease, (2) *the loss caused by the difference between the rent promised by [Tenant] and the rent ultimately received from the substitute tenants,* and (3) the costs attendant to the effort to secure substitute tenants." *Newman Dev. Grp. of Pottstown, LLC,* 162 EDA 2007 at 17 (emphasis added). The term "substitute tenants" was a term of art in the 2008 Memorandum decision, defined as referring to PetSmart and Michaels. *Id.* at 6. Thus, the prior panel of this Court found that Section 20.2.2 Damages only required a deduction for the rent received by PetSmart and Michaels, and did not need to account for any future tenant that might take over the spaces upon the expiration of the substitute tenants' leases. The panel also did not include any discussion of mitigation for the second half of Tenant's lease based upon probabilities that the substitute tenants would renew their leases.

When the case returned to the trial court on remand in 2008, the trial court did not include any deduction for mitigation for the second 10 years of Tenant's lease. In its opinion accompanying its amended verdict on remand, the trial court explained:

> The trial court considered § 20.2.2 to be a liquidated damages clause, in part, because in a circumstance such as is presented herein, mitigation [of] dam-
>
> ages cannot be determined without speculation because [Tenant's] lease period was for [20] years and the lease with the replacement tenants was only for [10] years. This finding was reversed. However, the trial court does find that the record supports that [Landlord] did make every reasonable good faith effort, as required in § 20.3 of the lease, to mitigate damages in an attempt to find replacement tenants.

Trial Court Opinion, 1/15/10, at 2 n. 3.

▮▮▮▮ Tenant asserts that the issue is not whether Landlord endeavored in good faith to secure replacement tenants for the full 20 years of Tenant's lease. Instead, it argues that it is a question of valuation—"how to calculate the mitigation that could be expected to occur over the second ten years." Tenant's Original Brief at 36 n. 14; Tenant's Original Reply Brief at 9. However, damages in a breach of contract action must be proved with reasonable certainty. *Helpin,* 10 A.3d at 270. Otherwise, they are generally not recoverable. *Spang & Co. v. U.S. Steel Corp.,* 519 Pa. 14, 545 A.2d 861, 866 (1988) ("As a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). The question of whether damages are speculative "has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages." *Wachovia Bank, N.A. v. Ferretti,* 935 A.2d 565, 572 (Pa.Super.2007). The burden is on the breaching party to show that further loss could have been avoided by reasonable efforts of the injured party. *Port-*

---

**18.** Notably, the trial court made no mention of Axler's calculation for mitigation of the second half of the lease.

*side Investors, L.P. v. N. Ins. Co. of New York*, 41 A.3d 1, 15 (Pa.Super.2011).

At the conclusion of their respective 10–year terms, PetSmart and Michaels had the option to renew their leases for two five-year periods, but there was no way to know at the time of the trial court's verdict whether either would renew, and if so, for what length of time.[19] The speculation of Tenant's mitigation amount is emphasized by Axler's testimony that there was a 50/50 chance that PetSmart and Michaels would *not* renew. *See* N.T., 1/19/06, at 68. The trial court's verdict is free of speculation and "bears a reasonable resemblance to the damages proven," *Hatwood*, 55 A.3d at 1240–41; thus, this argument lacks merit.

We now turn to Tenant's second argument, that Landlord "conceded" before the trial court and in its brief before the 2008 panel of this Court that damages must include mitigation for the second 10 years. *See* Tenant's Original Brief at 35 (citing N.T., 1/20/06, at 70–71 (Marchitelli's rebuttal testimony); Landlord's Brief in Support of Post–Trial Motion, 9/18/06, at 11–12; Landlord's Appellate Brief, 10/24/07, at 29). Our review of the documents cited does not support Tenant's argument. In each instance, Landlord conceded the appropriateness of a 50 percent likelihood of renewal as the appropriate *calculation* for mitigation over the remaining 10 years of Tenant's lease. Landlord did not concede the *existence* of any mitigation deduction. To the contrary, in its brief in support of its post-trial motion, for example, Landlord denied that it was required to account for any mitigation for the second 10 years of the lease, and offered the 50 percent renewal rate as an option only in the event the trial court found that such mitigation deduction was required. *See* Landlord's Brief in Support of Post–Trial Motion, 9/18/06, at 10–11.

As the arguments raised in support of the question of mitigation for the second 10 years of Tenant's lease are without merit, no relief is due.

## C. Interest on Damages

Tenant next asserts that the trial court erred by awarding Landlord interest on the damages for lost rent from the date Tenant committed the anticipatory breach of the lease agreement (February 13, 2002).[20] Tenant's Original Brief at 38.

19. If Tenant's argument is correct, then Tenant could be responsible for 50 years of rent because it had the option to renew the 20–year lease for six additional five-year terms. Lease Agreement, § 3.3.

20. Although Tenant refers to the interest awarded as "prejudgment interest," the record reflects that the trial court actually awarded Landlord "contractual interest." *See* Trial Court Opinion, 1/15/10, at 3. Our Supreme Court has explained the difference between the two as follows:

[T]here is a distinction between 'contractual interest' and 'prejudgment interest.' Where a contract provides for the payment of money and one party breaches the contract by failing to pay, the nonbreaching party may recover interest on the amount owed under the contract in one of two ways.

First, interest may be reserved by the terms of the contract between the parties and is then called conventional or contractual interest.

Alternatively, where the parties to a contract have not specifically addressed the payment of interest in the terms of the contract, the nonbreaching party may recover, as damages, interest on the amount due under the contract. This Court has referred to interest awarded as damages in such circumstances as prejudgment interest.

*TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 614 Pa. 549, 39 A.3d 253, 260–61 (2012) (footnote, internal citations and formatting omitted). The statutory prejudgment interest rate in Pennsylvania is six percent. *Id.* at 261; 41 P.S. § 202.

Citing to section 4.3 of the lease agreement, which addresses the default rate of interest under the heading "RENT," [21] Tenant states that Landlord was not entitled to interest on any money until Tenant was to begin paying rent on June 25, 2005. *Id.*

The record reflects that the trial court did not initially include any interest on Landlord's damages award, and that no party raised this issue at the time of the original verdict. *See* Trial Court Opinion, 8/15/06, at 14. Following the 2008 remand, Landlord requested damages and interest pursuant to section 20.4 of the lease agreement [22] beginning February 13, 2002, at a rate of prime plus two percent.[23] Landlord's Brief in Support of the Proper Calculation of Damages Pursuant to the Memorandum of the Superior Court, 11/5/08, at 2, 17. In response to Landlord's request, Tenant conceded that Landlord "may recover interest," but insisted that such interest did not begin to accrue until June 25, 2005, the date Tenant would have begun to pay rent had it not breached the lease. Tenant's Memorandum Regarding Outstanding Issues on Remand, 11/6/08, at 11. To support its position before the trial

court, Tenant relied on the wording of section 20.4 of the lease that "all sums of money *owed to Landlord* under this Lease shall bear interest at the Default Rate until the sums are paid to the Landlord." *Id.* (emphasis supplied). Tenant also pointed to section 4.3 of the lease—the section upon which it relies on appeal—which states that rental payments must be paid within 15 days of the due date, and if not paid, the amount bears interest *"from its due date* at the Default Rate[.]" *Id.* (emphasis supplied). The trial court ultimately awarded Landlord contractual interest of $6,279,734.26 "from the date of the anticipatory breach of the contract on February 13, 2002 pursuant to §§ 20.4 and 1.15 of the lease." Trial Court Opinion, 1/15/10, at 3.

As noted above, Tenant argues on appeal that the trial court's interest award was erroneous based upon the language contained in section 4.3 of the lease agreement. Tenant's Original Brief at 38. However, the trial court did not award "default interest" under section 4.3 for failing to pay rent; it awarded interest pursuant to section 20.4 of the lease as part of

21. This section provides: "If any rent is not paid within fifteen (15) days after its due date, then, in consideration of Landlord's additional expense caused by such failure to pay such sums, such arrearage shall bear interest from its due date at the Default Rate until paid and such interest shall be payable without demand simultaneously with the Rent arrearage." Lease Agreement, § 4.3.

22. Section 20.4 of the lease, which addresses expenses under the heading "DEFAULT & REMEDIES," states: "At any time following a default, in the event that the Landlord commences suit for the repossession of the Lease Premises, for the recovery of Rent or any other amount due under the provision of this Lease, or because of the breach of any other covenant herein contained on the part of the Tenant to be kept or performed, and a breach shall be established, the Tenant shall pay to

the Landlord all expenses incurred in connection therewith, including reasonable attorneys' fees and costs. If the Tenant defaults under this Lease, all sums of money owed to the Landlord under this Lease shall bear interest at the Default Rate until the sums are paid to the Landlord." *Id.* at § 20.4.

As stated above, section 1.15 defines "Default Rate" as the "lesser of: (a) the Prime Rate (as hereinafter defined) plus two percent (2%) per annum; or (b) the highest interest rate permitted by Applicable Law." *Id.* at § 1.15. Section 1.44 of the lease defines Prime Rate as "the published prime rate as reported in the Money Rates section of the Wall Street Journal (or its successor)." *Id.* at § 1.44.

23. Tenant did not raise an argument that Landlord waived the issue before the trial court, nor does it make any such claim on appeal.

its remedy for Tenant's anticipatory breach. Section 4.3 of the lease is inapplicable to the circumstances before us, as Tenant did not occupy the premises and simply fail to make timely payments of its rental obligation. Rather, Tenant refused to occupy the property in the first instance, which, as the trial court found and this Court affirmed, amounted to an anticipatory breach of the lease agreement, creating at the time of the breach the obligation to pay Landlord all rent owed for the 20–year term.

Tenant also cites in support of its argument cases involving prejudgment interest. *Id.* at 39 (citing *Fernandez v. Levin,* 519 Pa. 375, 548 A.2d 1191, 1193 (1988); *Somerset Cmty. Hosp. v. Allan B. Mitchell & Associates, Inc.,* 454 Pa.Super. 188, 685 A.2d 141, 148 (1996)), 40 (citing *Trizechahn Gateway LLC v. Titus,* 930 A.2d 524, 543–44 (Pa.Super.2007), *rev'd in part on other grounds,* 601 Pa. 637, 976 A.2d 474 (2009)). These cases are inapplicable, as the trial court awarded Landlord ***contractual*** interest, not ***prejudgment*** interest. *See supra,* n. 20.

We find similarly unavailing Tenant's citation to section 354 of the Restatement (Second) of Contracts and section 66.112 of Williston on Contracts, as both also pertain to a party's right to prejudgment interest. Tenant's Original Brief at 39–40; *see* RESTATEMENT (SECOND) OF CONTRACTS § 354 cmt. a (1981); WILLISTON ON CONTRACTS § 66:112 (4th ed.). As comment "a" to section 354 of the Restatement clearly states, that section does not deal with "the injured party's right to interest under the terms of the contract. If the parties have agreed on the payment of interest, it is payable not as damages but pursuant to a contract duty that is enforceable as is any other such duty, subject to legal restrictions on the rate of interest." RESTATEMENT (SECOND) OF CONTRACTS § 354 cmt. a (1981).

The award of interest from February 13, 2002 on Landlord's damages was appropriate. The trial court determined, and the prior panel of this Court affirmed, that Tenant's February 13, 2002 refusal to proceed as contracted under the lease resulted in a total anticipatory breach of that lease, obligating Tenant at the time of the breach to pay Landlord all rent for the 20–year term. Pursuant to section 20.4 of the lease, interest at the defined Default Rate accompanied that obligation. The trial court therefore committed no error in awarding interest on Landlord's damages beginning February 13, 2002.

### D. Reletting Expenses

■ In its penultimate issue, Tenant faults the trial court for "awarding $534,629 in reletting expenses when it had previously found that figure not credible and [the Superior Court] affirmed that finding on appeal." Tenant's Original Brief at 40. The record reflects that Newman testified that Landlord incurred $536,629.00 in additional construction costs to accommodate PetSmart and Michaels following Tenant's breach. N.T., 1/17/06, at 90. Marchitelli provided conflicting testimony, indicating that Landlord ***saved*** $505,821.00 in construction costs when building for the replacement tenants. N.T., 11/10/05, at 78–79.

Faced with this conflicting evidence from two of Landlord's witnesses, the trial court credited Marchitelli's testimony and concluded, "[Landlord] failed to prove by a preponderance of the evidence that it is entitled to $536,629.00 in reletting expenses." Trial Court Order, 12/19/06, at 2 n. 2; Trial Court Opinion, 5/8/07, at 19–20; *see Health Care & Ret. Corp. of Am. v. Pittas,* 46 A.3d 719, 723 (Pa.Super.2012) ("It is well-settled that credibility determinations are for the fact-finder, which is entitled to believe all, part or none of the evidence presented.") (citation omitted),

*appeal denied,* 619 Pa. 706, 63 A.3d 1248 (2013). On appeal, the 2008 panel of this Court affirmed that credibility determination finding it "was amply supported by the record," and instructing that "any cost savings associated with [Tenant's] breach must be deducted from the trial court's assessment of damages." *Newman Dev. Grp. of Pottstown, LLC,* 162 EDA 2007, at 19 n. 9.

On remand, the trial court again confirmed that it "did not find the testimony offered by Marc Newman creditable on the issue of additional construction costs." Trial Court Opinion, 1/15/10, at 2 n. 4. For reasons unknown, when calculating damages, the trial court nonetheless awarded $30,808.00 in reletting expenses, which it calculated by subtracting the $505,821.00 construction savings credibly testified to by Marchitelli from the $536,629.00 in additional costs that Newman testified Landlord experienced because of Tenant's breach. *Id.*

Because the trial court found that Newman's testimony concerning the $536,629.00 was not credible, and this Court affirmed that finding on appeal, it was error for the trial court to include the $536,629.00 figure in the damage calculation. *See Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1331 (1995) ("upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter"). Thus, remand is required for the trial court to account solely for the savings Marchitelli testified Landlord experienced as a result of the breach by Tenant.

**E. Interest on Attorneys' Fees and Costs**

▮ In its final issue on appeal, Tenant contends that the trial court erred by awarding Landlord interest on its attorneys' fees and costs accruing prior to the entry of judgment. Tenant's Original Brief at 42–44. Tenant agrees that the "base amount" of attorneys' fees, costs and expenses sought by Landlord—$1,271,-462.06—is reasonable,[24] but contests the addition of interest on that award prior to the entry of judgment, as "[Tenant] had no contractual obligation to pay [Landlord's] fees and costs at the time they were being incurred." *Id.* at 42–43.

The record reflects that in its January 15, 2010 opinion, the trial court found that pursuant to sections 20.4 and 24.10 of the lease agreement, Landlord was entitled to reasonable attorneys' fees and expenses. Trial Court Opinion, 1/15/10, at 3. Land-

---

24. In a footnote, Tenant raises the issue of whether Landlord is in fact entitled to attorneys' fees and costs pursuant to section 24.10 of the lease agreement. Tenant's Original Brief at 43 n. 16. Section 24.10 states that the prevailing party in litigation between the parties is entitled to all reasonable expenses and costs, including attorneys' fees. Lease Agreement, § 24.10. It further defines "prevailing party," in relevant part, as the party that "initiated the litigation and substantially obtains the relief it sought[.]" *Id.* Tenant asserts that if this Court orders a significant reduction in Landlord's damages award, the trial court's award of attorneys' fees, costs and expenses should be revisited, as Landlord would no longer meet the definition of a "prevailing party" under the lease. Tenant's Orig-inal Brief at 43 n. 16. As is clear from our discussion *supra,* we have not significantly reduced Landlord's damages award, and thus there is no need for the trial court to revisit the grant of attorneys' fees and costs to Landlord pursuant to section 24.10 of the lease. Moreover, this issue does not appear in Tenant's concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) or its statement of questions involved pursuant to Pa.R.A.P. 2116. Thus, the issue is waived. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

lord subsequently provided Tenant with calculations setting forth its attorneys' fees, costs and expenses, plus interest, totaling $1,684,189.34. Affidavit of Jeanette Simone in Support of Landlord's Calculation of Attorneys' Fees, Costs, Expenses and Interest, 2/19/10, at 2. This included interest at a rate of prime plus two percent beginning on August 31, 2003 for Landlord's attorneys' fees, December 14, 2004 for its litigation expenses, and August 20, 2004 for the cost of retaining Marchitelli as an expert witness. *Id.* at Exhibit C. In response, Tenant authored a letter to the trial court in which it agreed that the fees and costs included by Landlord were reasonable and that prime plus two percent was the correct interest rate, but contesting (as it does on appeal) the propriety of an award of interest on the fees, costs and expenses prior to the date of judgment.[25] *Id.* at Exhibit B. In its March 1, 2010 order, the trial court awarded Landlord $1,684,189.34 in attorney fees, costs and expenses with interest. Trial Court Order, 3/1/10, at n. 1. It reserved the ability to award further attorneys' fees, costs, expenses and interest following the conclusion of the appellate process. *Id.*

The trial court relied on sections 20.4 and 24.10 of the lease agreement in support of its award of interest on Landlord's attorneys' fees, costs and expenses. As we noted above, section 20.4 states:

20.4 *Expenses.* At any time following a default, in the event that the Landlord commences suit for the repossession of the Lease Premises, for the recovery of Rent or any other amount due under the provision of this Lease, or because of the breach of any other covenant herein contained on the part of the Tenant to be kept or performed, and a breach shall be established, the Tenant shall pay to the Landlord all expenses incurred in connection therewith, including reasonable attorneys' fees and costs. If the Tenant defaults under this Lease, all sums of money owed to the Landlord under this Lease shall bear interest at the Default Rate until the sums are paid to the Landlord.

Lease Agreement, § 20.4. Section 24.10 states, in pertinent part:

24.10 *Attorneys' Fees.* In any litigation between the parties regarding this Lease, the losing party shall pay to the prevailing party all reasonable expenses and court costs including attorneys' fees incurred by the prevailing party. A party shall be considered the prevailing party if [ ... ] it initiated the litigation and substantially obtains the relief it sought, either through a judgment or the losing party's voluntary action before arbitration (after it is scheduled), trial or judgment.

*Id.* at § 24.10.

Reading these sections to give both parts effect, as we are required to, *see*

---

**25.** Landlord asserts that Tenant's letter to the trial court raising the question of whether interest on the attorneys' fees, costs and expenses could be granted prior to the trial court's verdict was insufficient to preserve this issue for our review, as Tenant "did not make application to the trial court to hear the issue[.]" Landlord's Original Brief at 42. This is inaccurate. Rather, Tenant expressly requested "the opportunity to submit a memorandum of law on this issue." Affidavit of Jeanette Simone in Support of Landlord's Calculation of Attorneys' Fees, Costs, Expenses and Interest, 2/19/10, at Exhibit B. Landlord responded with its own letter and urged the trial court to deny the request. Landlord's Letter, 2/19/10. On March 1, 2010, the trial court entered its verdict without any recognition of Tenant's request. *See* Trial Court Order, 3/1/10. As the issue was raised before the trial court, we disagree that Tenant has waived this claim on appeal. *Cf.* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

*Seven Springs Farm Inc.,* 748 A.2d at 746, it is clear that Tenant did not become responsible for paying Landlord's attorneys' fee, costs and expenses until Landlord became the "prevailing party." By definition in the lease, this did not occur until the trial court rendered its verdict finding in Landlord's favor. *See* Lease Agreement, § 24.10. We therefore conclude that, pursuant to the lease agreement, Landlord was entitled to interest on its attorneys' fees, costs and expenses beginning on August 15, 2006, the date of the trial court's original verdict.

### Conclusion

In summary, we affirm the trial court's decision not to reduce the damages awarded to Landlord to present value, its determination regarding the amount to deduct from the award in mitigation, and its grant of contractual interest beginning on February 13, 2002. We vacate the verdict and remand, finding error in the trial court's inclusion of reletting expenses testified to by Newman in the award on remand and its calculation of interest on Landlord's attorneys' fees, costs and expenses beginning prior to the court's original verdict in favor of Landlord. On remand, the trial court is instructed to recalculate the damages award, omitting the reletting expenses testified to by Newman and accounting only for the cost savings associated with Tenant's breach as testified to by Marchitelli, and providing Landlord interest on its attorneys' fees, costs and expenses beginning on August 15, 2006.

Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.

FORD ELLIOTT, P.J.E. files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY FORD ELLIOTT, P.J.E.:

I join in the Majority decision in all respects except the rejection of the reduction to present value of the Section 20.2.2 damages. Although I cannot disagree with the discussion of contract law as set forth by the Majority, I dissent purely on the basis of the actual record before the court.

As set forth by the Majority, reargument was granted to reconsider the decision of July 29, 2013. I joined the Opinion by Judge Stevens, now Justice Stevens, in his review of the proceedings below. We determined that Landlord, throughout the trial and post-trial proceeding, addressed the issue of reduction to present value as a remedy. We further determined that nothing in this court's earlier decision to remand precluded a reduction to present value. I set forth the rationale of the prior decision as the basis for my dissent.

We turn first to Tenant's allegations regarding reduction to present value, mitigation, and reletting expenses. In order to address these claims, it is necessary to set forth in greater detail the positions taken by the parties during this lengthy matter.

Throughout these proceedings, Landlord consistently suggested to the courts that there were three possible damage amounts to which it was entitled. It is undisputed that Landlord's primary damage theory requested damages of $5,511,219.00, representing lost profits from the sale of the shopping center. N.T. 11/10/05 at 52, 65, 82; Landlord's Proposed Findings of Fact filed 4/5/06 at 91; Landlord's Proposed Conclusions of Law filed 4/5/06 at 40, 49–50; Landlord's Response to Tenant's Motion to Strike

New Damages Figures and Calculations filed 4/27/06 at 2, fn. 1; Landlord's Post Trial Motion filed 9/18/06 at 2. The evidence in support of this theory of damages was presented through Richard Marchitelli, Landlord's expert witness. Landlord held out Mr. Marchitelli's theory of damages to be "the most comprehensive and appropriate measure of damages," and this is the amount Landlord requested of Judge Mahon at both the trial and post trial levels. Landlord's Proposed Conclusions of Law filed 4/5/06 at 6, 40, 52; Landlord's Post Trial Motion filed 9/18/06 at 2.[Footnote 8]

[Footnote 8] Judge Mahon rejected this damage theory and the accompanying proposed damage amount at both the trial and post trial level, finding it "highly speculative" and "inappropriate" to support a damage award. Opinion filed 8/15/06 at 14; Post Trial Order filed 12/19/06 at 1, fn. 2.

As an alternative to its $5,511,219.00 damages request, Landlord proffered a lesser figure to which it alleged entitlement under Section 20.2.2 of the "Default & Remedies" section of the parties' Lease.[Footnote 9] Under this theory, Landlord asserted that Tenant's breach had deprived Landlord of the benefit of the bargain of the twenty year lease. Landlord's Proposed Conclusions of Law filed 4/5/06 at 40–41. Landlord further asserted that pursuant to Section 20.2.2, it properly mitigated its damages by securing replacement tenants, and had incurred reletting expenses in doing so. *Id.* at 41.

[Footnote 9] The Default & Remedies portion of the parties' Lease set forth actions/inactions that would constitute a "Tenant default," §§ 20.1.1–20.1.2, then provided that in the event of a Tenant default, Landlord had the right to terminate the lease, § 20.2.1, and/or lease the premises to another party (without terminating the Lease), § 20.2.2. Pertaining to this reletting, Section 20.2.2 read as follows:

20.2.2. *Reletting:* Without terminating this Lease, Landlord may re-enter and repossess the Leased Premises, or any part thereof, and lease them to any other Person upon such terms as are reasonable, for a term within or beyond the Term. Any such reletting shall be for the account of Tenant, and Tenant shall remain liable for the excess (if any) of: (a) all Rent which would be payable under this Lease by Tenant in the absence of such repossession; over (b) the proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds any Reletting Expenses ... No repossession of the Leased Premises or any part thereof pursuant to this section 20.2.2. shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such repossession, and Landlord may, at its option, sue for and collect all Rent and other charges due hereunder at any time when such charges accrue.

Lease Agreement, "Default & Remedies" § 20.2.2.

Landlord thus requested at trial that Judge Mahon award Section 20.2.2 damages calculated by:

taking nine (9) months of rent [Tenant] would have already paid ($531,534)[Footnote 10] adding the present value of the remainder of [Tenant's] Lease ($6,616,978), subtracting the present value of the Michael's lease ($1,270.409), subtracting the present value of the PetSmart lease ($1,667,382) and finally, adding in the reletting expenses ($536,629), resulting in a total damages figure of $4,746,850.

[Footnote 10] Landlord asserted that had Tenant not breached the Lease, Tenant would

have taken possession of the space on December 1, 2004, and after the benefit of three months free rent, would have begun paying rent to Landlord on March 1, 2005. Landlord's Proposed Conclusions of Law filed 4/5/06 at 41. Thus, by the time the shopping center was sold at the end of 2005, Tenant would have paid $531,534.00 in rent to Landlord. *Id.* at 42. Landlord explained that "this past due rent does not get adjusted to present value, just added into the final calculation of damages." *Id.* at 42.

*Id.* at 42 (underline in original).

In suggesting Section 20.2.2 damages of $4,746,850.00, Landlord insisted that despite its best efforts, the replacement tenants only signed ten year leases, and Landlord could not assume they would renew at the end of the ten year period. Landlord's Proposed Conclusions of Law filed 4/5/06 at 42. Thus, the $4,746,850.00 figure did not include mitigation for the second ten year term of Tenant's twenty year lease period.

Although disputing that it had an ongoing duty to mitigate during the second ten year period, Landlord proposed a second Section 20.2.2 damage figure in response to testimony from Tenant's expert witness, whereby Landlord suggested that if it was determined that mitigation was required for the second ten year period, damages should be calculated as follows:

adding the nine (9) months of [Tenant's] rent, $531,534, with the present value of [Tenant's] Lease ($6,616,978), subtracting the present value of the PetsMart ($2,193,068) and Michael's ($1,639,387) leases—both of which assume a fifty percent (50%) renewal for the remaining term of [Tenant's] Lease, and adding in construction costs ($536,629) for a total of $3,852,186.

*Id.* at 44 (underline in original).

It is thus apparent that Landlord conceded that any Section 20.2.2 damages

awarded to it would be reduced to present value.[Footnote 11] This position is consistent with an exchange that occurred during the presentation of the testimony of Marc Newman in support of Section 20.2.2 damages.

[Footnote 11] Were the Section 20.2.2 amounts *not* reduced to present value, the damages requested via Landlord's *alternate* damage theory would have exceeded the $5,511,219.00 figure sought by its *primary* damage theory—a financially illogical and improbable scenario.

In rebutting the damages calculations made by Mr. Marchitelli and Mr. Newman, Tenant had introduced the testimony and report of Michael Axler. Pertinent to the appeal currently before us, Mr. Axler opined that because Landlord had an ongoing obligation to mitigate after the expiration of the replacement tenants' ten year leases, Mr. Newman erroneously failed to account for rent due during the second ten years of the twenty year term of Tenant's lease. N.T. 1/19/05 at 63. Additionally, Mr. Axler suggested that the damage calculations performed by Mr. Newman should be reduced to present value, resulting in damages of $2,947,698.00 (Tenant's rent over 20 years, minus rent from replacement tenants over 20 years, plus construction costs). *Id.* at 68–69. Exhibit D–100 (Mr. Axler's "Response to Newman Alternate Damages Claim" (in which Mr. Axler used a rate of 9%)). When Tenant sought to introduce Exhibit D–100, Landlord objected and the following discussion over the propriety of reducing the damages to present value occurred:

**[Landlord]:** My objection is to any testimony or any of these calculations regarding the first ten years of [Tenant's] lease, the PetsMart lease, and the Michael's lease as indicated in this document.

**The Court:** And you're offering the first ten years for what purpose?

**[Tenant]:** Well, the only difference in the first ten years presented by Marc Newman and Mr. Axler is the discounted present value and this is a portion of his opinion.

**The Court:** And do you object to that?

**[Landlord]:** Only to the extent that he offers an opinion as to what that percentage interest was to use *for present value,* the numbers.

N.T. 1/19/06 at 64–65 (emphasis added). After brief additional comments, Landlord clarified that it objected to "the introduction of this testimony *as to present value.*" *Id.* at 65 (emphasis added). Tenant then complained "[y]our Honor, she just changed her objection. A minute ago she said she was objecting to the *rate,* not the *concept* of discount." *Id.* (emphasis added). The following exchange then occurred:

**The Court:** Well, you can't introduce—it doesn't make a difference what her objection is, it's to the introduction of the present value based upon percentage calculation or something else. Is that the basis?

**[Landlord]:** That's the basis, your Honor.

**[Tenant]:** I think, your Honor, if I understand [Landlord] correctly, what he is saying, [Landlord] agree[s] there should be discount for present value, but dispute[s] the rate. I would submit that's inappropriate [sic] for cross-examination of Mr. Axler, not admissibility issue.

**The Court:** Is that your issue?

**[Landlord]:** Your Honor, the issue is two-fold. That he is offering expert testimony as to a factual matter that has not been included in his report, and—

**The Court:** One to ten years, one to ten are not going to be considered by me other than on the issue of present value, one to ten, ten years on the leases calculation of the figures introduced, if I allow it to be introduced for that purpose.

**[Landlord]:** Objection, your Honor.

The Court: What is your objection now?

. . .

**The Court:** You're still asking that it be exclude because of the rate Mr. Axler has used for purpose of determining present value?

**[Landlord]:** Yes, your Honor. The rate Mr. Axler has used, in and of itself, is an expert opinion as to what that rate should be. And this is a factual matter. It's a matter for the Court to decide and it's a matter that [Tenant] [was] on notice of that this testimony would be offered.

**The Court:** Are you saying I'm supposed to make a determination as to what the present value is?

**[Landlord]:** It is within the Court's purview your Honor. Yes, you can, but there was also factual evidence as to what rate was to be used.

*Id.* at 65–67. It is clear from this exchange that Landlord did not object at trial to the reduction to present value. In addition, when Mr. Axler was later questioned about the present value rate used in his calculations on cross examination, re-direct examination, and re-cross examination, Landlord did not even renew its objection to that rate, much less contest that the underlying reduction to present value of the Section 20.2.2 damages was to occur. N.T. 1/19/06 at 137, 139, 145, 147.

Further, Mr. Marchitelli was recalled to rebut Mr. Axler's testimony and Ex-

hibit D–100, containing Mr. Axler's present value calculation of Mr. Newman's alternate damage figures. N.T. 1/20/06. Landlord's Exhibit P–434 was introduced into evidence, correcting alleged errors in *Mr. Axler's* calculations and providing *Mr. Marchitelli's* present value calculation of Mr. Newman's alternate damage figures resulting in total damages of $3,852,186.00. *Id.* at 68–72, 92. In so doing, Mr. Marchitelli used the same rate as had Mr. Axler to discount the figures to present value. *Id.* at 71.

Landlord continued to request Section 20.2.2 damages *reduced to present value* at the post trial level, averring that Landlord "[c]ould also be made whole by calculating damages based upon lost rental income as specifically set forth in Section 20.2.2." Landlord's Post Trial Motion filed 9/18/06 at 8; Landlord's Memorandum of Law in Support of Post Trial Motion filed 11/8/06 at 18–19, 32. In its post trial request that the damage award be modified, Landlord stated:

> [Judge Mahon] actually found Marc Newman's calculation of damages in years 1–10 to be reliable. Thus, there is no question that [Landlord] is at least entitled to recover damages for present value of lost rent through the first 10 years and 9 months, ($2,713,-739.00 as set forth above). [Landlord] should have, at a minimum been awarded the lost rental income for the first 10 years and nine months to which there is no dispute and no speculation.
>
> While there was no legal obligation for [Landlord] to find a replacement tenant for the same lease length, if the Court determined some rent must be attribute to the last 9 years and 3 months, sufficient evidence and calculation to find such, has been presented to the Court. In fact, both [Tenant's]

"expert," Axler and [Landlord's] expert, Marchitelli, agreed that a 50% renewal probability is a reasonable assumption and methodology for calculating the remaining anticipated rent. While both experts concur that a 50% renewal probability is reasonable, Axler's calculations were admittedly incomplete. Marchitelli adopted and modified Axler's calculations using standard real estate assumptions, which were supported by the testimony of March Newman and uncontested. Ultimately, Marchitelli calculated the present value of [Landlord's] damages, per the Remedies section of the Lease, to be $3,852,186.00.

Landlord's Memorandum of Law in Support of Post Trial Motion filed 11/8/06 at 24. Thus, Landlord's Post Trial Motion preserved the request for a Section 20.2.2 damage figure *reduced to present value.*

Landlord argued on the previous direct appeal to the Superior Court that it had presented "two alternate theories of damages, either of which would have acted to award [Landlord] its expectation damages," and that the damages awarded by Judge Mahon were "insufficient in that they failed to award [Landlord] its expectation damages, necessary to make [Landlord] whole." Landlord's Pa.R.A.P.1925(b) Statement of Matters Complained of on Appeal filed 1/31/07. As it had up to that point, Landlord structured its appellate brief to primarily argue in favor or damages based on the diminished sale price of the shopping center allegedly attributable to Tenant's breach, and only secondarily requested Section 20.2.2 damages. Landlord's Pa. R.A.P.1925(b) Statement of Matters Complained of on Appeal filed 1/31/07 at 21, 24.

Thus, we find it abundantly clear from the contents of the certified record that neither the trial court nor the prior panel of the Superior Court was asked to award Section 20.2.2 damages *not* reduced to present value. Quite to the contrary, Landlord's damages requests were figures consistently so reduced. While the parties argued over numerous other aspects of this case, the propriety of reduction to present value was simply not made an issue. Unsurprisingly, the April 25, 2008 Memorandum of the Superior Court is thus silent on the topic, and we discern nothing in that Memorandum which would permit Landlord to abandon on remand its consistently held position in this regard, and argue instead that the trial court must award Section 20.2.2 damages *not* reduced to present value. Our exhaustive review of the record in this case compels the conclusion that it does not support Judge Mahon's failure to reduce Landlord's damages to present value. Therefore, we find it necessary to vacate the award of damages and remand the matter for calculation of damages ·reduced to present value.

*Newman Development Group of Pottstown, LLC v. Genuardi's Family Market, Inc.,* 2013 Pa.Super. 217 (2013), en banc reargument granted and case withdrawn 10/2/13.

Based on the above rationale, I respectfully dissent on this issue.

